IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

GEORGIA MUSLIM VOTER
PROJECT and ASIAN-AMERICANS
ADVANCING JUSTICE-ATLANTA,

    Plaintiff,

vs.

BRIAN KEMP, in his official capacity
as the Secretary of State of Georgia; and
GWINNETT COUNTY BOARD OF
VOTER REGISTRATION AND
ELECTIONS, on behalf of itself and
similarly situated boards of registrars in
all 159 counties in Georgia,

    Defendants.

Civil Action No.: 1:18-cv-04789-LMM

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION
FOR TEMPORARY RESTRAINING ORDER**

# TABLE OF CONTENTS

FACTUAL BACKGROUND                                                                          2

  Signature Matching at the Absentee Ballot Application Stage                     3

  Signature Matching at the Absentee Ballot Stage                                 5

  Georgia Law Does Not Provide Adequate Due Process Guarantees in Either
  Phase of the Absentee Ballot Process                                            6

  Other Absentee Voters in Similar Circumstances Are Provided Due Process         7

ARGUMENT                                                                                    7

I.   PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO SUCCEED ON THE
MERITS OF COUNT ONE'S PROCEDURAL DUE PROCESS CHALLENGE         8

  A.  The Private Interest Affected Is of Paramount Importance            11

  B.  The Risk of Erroneous Removal Is Substantial, and Applying the Same
  Safeguards for Other Absentee Voters Can Significantly Reduce that Risk       12

    1.  *The risk of a voter's absentee ballot being erroneously rejected is
    substantial*                                                          12

    2.  *The probative value of additional procedural safeguards is significant*   16

  C.  Additional Procedures Involve Minimal Administrative Burdens Because
  They Already Exist                                                            17

II. PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO SUCCEED ON THE
MERITS OF COUNT TWO'S PROCEDURAL DUE PROCESS CHALLENGE23

III.   THE REMAINING TEMPORARY RESTRAINING ORDER FACTORS
WEIGH IN PLAINTIFFS' FAVOR                                                        23

CONCLUSION                                                                                 25

Plaintiffs seek emergency relief to stop an ongoing constitutional train wreck that threatens to disenfranchise potentially hundreds, if not thousands, of voters casting absentee ballots leading up to this year's November 2018 general election. In the alternative, Plaintiffs respectfully request an immediate hearing.

"No right is more precious in a free country than having a voice in the election of those who make the laws under which, as good citizens, we must live." *Reynolds v. Sims*, 377 U.S. 533, 560 (1964). But in Georgia, this sacred right can be stripped from certain voters without constitutionally mandated due process. Georgia law requires county elections officials, laypersons who are not handwriting experts, to reject an absentee ballot when they subjectively determine that the signature on the ballot does not match the signature on file. The voter does not get any pre-rejection notice or an opportunity to be heard, or any opportunity for appeal. O.C.G.A. § 21-2-386(a)(1)(B)-(C). Another Georgia statute similarly requires the rejection of absentee ballot applications where there is an alleged signature mismatch without providing pre-rejection notice or an opportunity to be heard. O.C.G.A. § 21-2-381(b)(1)-(3). This violates the Due Process Clause.

These statutes' lack of adequate due process for absentee voters based on an alleged signature mismatch contrasts starkly with the notice and opportunity to be heard provided to absentee voters whose ballots are challenged on other grounds,

1

*i.e.*, on grounds that the voter is ineligible to vote. *See* O.C.G.A. § 21-2-230(g).

Plaintiffs simply ask that the same notice and opportunity to be heard afforded to

other absentee voters under Georgia law also be extended to voters whose ballots

or applications are rejected because of an alleged signature mismatch.

Though early voting in Georgia for the 2018 general election has just started,

over 500 absentee ballots or ballot applications have already been rejected under

these signature-matching provisions. An October 12 news article further suggests

that Gwinnett County is responsible for a disproportionate share of these

rejections.[1] Given the urgency of the upcoming elections, and in response to these

recent reports, Plaintiffs seek a temporary restraining order directing the relief

described below and in the accompanying motion and proposed order.

## FACTUAL BACKGROUND

This motion rests solely on Plaintiffs' procedural due process challenge to

O.C.G.A. § 21-2-386(a)(1)(B)-(C), the signature matching process for accepting

completed absentee ballots (Count One); and Plaintiffs' procedural due process

---

[1] Jordan Wilkie, "Exclusive: High Rate of Absentee Ballot Rejection Reeks of Voter Suppression," *Who.What.Why.*, October 12, 2018, *found at:* https://whowhatwhy.org/2018/10/12/exclusive-high-rate-of-absentee-ballot-rejection-reeks-of-voter-suppression/ (last visited October 16, 2018).

challenge to O.C.G.A. § 21-2-381(b)(1)-(3), the signature matching process for reviewing applications for an absentee ballot (Count Two).

**Signature Matching at the Absentee Ballot Application Stage**

Georgia law allows voters to cast an absentee ballot through the mail before Election Day regardless of whether they are capable of voting in-person. O.C.G.A. § 21-2-380. Nevertheless, some voters have no choice but to vote by absentee ballot because they cannot vote in-person whether because of physical disability, lack of transportation, or out-of-town travel. To vote by absentee ballot, a voter must first submit an absentee ballot application via mail, fax, e-mail, or in-person. O.C.G.A. § 21-2-381. The application can be submitted as early as 180 days and as late as the Friday before Election Day (since absentee ballots cannot be mailed the day before Election Day). *See* O.C.G.A. §§ 21-2-381(a)(1)(A); 21-2-384(a)(2).

When an absentee ballot application is received, the county registrar[2] determines whether the voter is eligible. O.C.G.A. § 21-2-381(b)(1). This provision, however, does not set a time limit by which the county registrar must process the received application. When evaluating an application, the county

---

[2] This brief uses the term "county registrar" as a shorthand to include any board of registrars or absentee ballot clerks, who are charged with enforcing the statutes at issue in this litigation.

registrar is required to compare the signature on the absentee ballot application to the signature on file. *See id.* ("the registrar or absentee ballot clerk shall . . . compare the signature or mark of the elector on the application with the signature or mark of the elector on the elector's voter registration card."). Georgia law, however, does not require elections officials to become handwriting experts, nor does the law provide any guidance whatsoever on how to determine whether the signatures qualify as a match. Likewise, there is no provision requiring or even allowing registrars to consider extrinsic evidence that might help them confirm the identity of the absentee ballot applicant before rejecting the application solely on the basis of a subjective determination about signature similarities.

If the registrar subjectively deems the signatures not to match, "the board of registrars shall deny the application by writing the reason for rejection in the proper space on the application and shall promptly notify the applicant in writing of the ground of ineligibility." O.C.G.A. § 21-2-381(b)(3). Though the law requires that the rejection notice be sent "promptly," there is no specific time limit set.

At least 493 absentee ballot applications have been rejected thus far for the 2018 general election on this basis. *See* Exhibit A (Ali Decl.) ¶ 7.

**Signature Matching at the Absentee Ballot Stage**

If the applicant's eligibility is confirmed, the registrar mails an absentee ballot to the voter (with exceptions not relevant here). O.C.G.A. § 21-2-381(b)(2). Such ballots are mailed from 49 days before Election Day up to the Friday before Election Day. O.C.G.A. § 21-2-384(a)(2). There is no time limit as to when the registrar must send the absentee ballot once the application has been processed.

When the absentee voter receives an official absentee ballot, they receive two envelopes. The completed absentee ballot must be put in the smaller envelope. The back of the larger envelope has an oath swearing to eligibility (among other matters), as well as a line for the voter's signature. O.C.G.A. § 21-2-384(c)(1). The smaller envelope must be placed in the larger and returned to the county registrar.

Once the absentee ballot is received, the county registrar "shall compare the signature or mark on the oath with the signature or mark on the absentee voter's voter registration card or the most recent update to such absentee elector's voter registration card and application for absentee ballot or a facsimile of said signature or mark taken from said card or application." O.C.G.A. § 21-2-386(a)(1)(B). If the "signature does not appear to be valid, . . . the registrar or clerk shall write across the face of the envelope 'Rejected,' giving the reason therefor. The board of registrars or absentee ballot clerk shall promptly notify the elector of such

rejection." O.C.G.A. § 21-2-386(a)(1)(C). Again, Georgia law does not require elections officials to become handwriting analysis experts or permit them to consider extrinsic evidence. And while elections officials must "promptly" notify voters that their ballot was rejected there is no specific time limit to do so.

Over 100 absentee ballots have been rejected so far in this election. *See* Exhibit A (Ali Decl.) ¶ 7.

### Georgia Law Does Not Provide Adequate Due Process Guarantees in Either Phase of the Absentee Ballot Process

Georgia law does not provide the absentee ballot applicant with an alleged signature mismatch pre-rejection notice or an opportunity to be heard, *i.e.*, to confirm their identity or otherwise explain the alleged mismatch. Similarly, at the absentee ballot stage, Georgia law also does not provide the voter casting an absentee ballot with an alleged signature mismatch pre-rejection notice or an opportunity to be heard, *i.e.*, to confirm their identity or otherwise explain the alleged mismatch. There is no procedure by which a voter can contest a registrar's decision that the voters' two signatures do not match, nor are there any additional layers of review of that decision, either by a court or by the Secretary of State. In other words, the registrar's decision is final.

**Other Absentee Voters in Similar Circumstances Are Provided Due Process**

Notably, other Georgia laws provide absentee votes with notice and an opportunity to be heard in similar circumstances. For absentee voters whose ballots are challenged on grounds that the voter is allegedly unqualified to vote, Georgia law requires notice, a hearing "on an expedited basis," and an opportunity for judicial appeal to resolve whether that ballot should be counted. *See* O.C.G.A. § 21-2-230(g). These procedural protections must be provided, moreover, even if they cannot be completed prior to the close of the polls on Election Day. *See id.* These protections do not apply, however, to the provisions challenged here.

## ARGUMENT

Plaintiffs urgently seek a TRO pursuant to Fed. R. Civ. P. 65(b) that will prevent elections officials from rejecting absentee ballots or absentee ballot applications on the basis of an alleged signature mismatch without providing pre-rejection notice and an opportunity to be heard. A TRO is warranted if the movant demonstrates: (1) a substantial likelihood of success on the merits; (2) irreparable harm in the absence of an injunction; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) that an injunction would not disserve the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Faircloth v. Baden*, No. 1:11-

7

CV-86 (WLS), 2011 WL 7640351 (M.D. Ga. Aug. 1, 2011) (standards for obtaining a TRO is identical to that for obtaining a preliminary injunction).

As discussed below: I) Plaintiffs are substantially likely to succeed on the merits of their procedural due process challenge to the signature matching procedure at the absentee ballot stage (Count One), just as several other courts have struck down similar signature matching procedures in other states for lack of due process; II) Plaintiffs are substantially likely to succeed on the merits of their procedural due process challenge to the signature matching procedure at the absentee ballot application stage (Count Two); and III) the remaining TRO factors are satisfied in this case.[3]

## I.  PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO SUCCEED ON THE MERITS OF COUNT ONE'S PROCEDURAL DUE PROCESS CHALLENGE

Plaintiffs are substantially likely to succeed on the merits of Count One's procedural due process challenge against O.C.G.A. § 21-2-386(a)(1)(B)-(C), which

_____

[3] Plaintiffs are organizations who are actively involved in voting and voter registration activities and would divert resources from its regular activities to educate and assist voters in guarding against wrongful removals on grounds of criminal conviction. *See* Exhibits A, B. Plaintiffs thus have organizational standing to bring this action. *See Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1350-51 (11th Cir. 2009) (voter registration organizations had standing to vindicate individuals' voting rights due to diversion of resources).

mandates the rejection of absentee ballots when an elections official subjectively determines that the voter's signatures do not match without pre-rejection notice or an opportunity to be heard. As discussed below, numerous courts have struck down signature matching requirements that fail to provide due process.

The Due Process Clause of the Fourteenth Amendment provides that a state shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Plaintiffs must satisfy "three elements: (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." *J.R. v. Hansen*, 736 F.3d 959, 965 (11th Cir. 2013) ("*Hansen I*").

The first two elements are plainly satisfied here. The challenged statute deprives registered voters of a constitutionally-protected liberty interest in the right to vote. Over 50 years ago, the Fifth Circuit[4] recognized that the right to register to vote is protected by procedural due process guarantees, because "[t]he right to vote is one of the most important and powerful privileges which our democratic form of government has to offer." *United States v. Atkins*, 323 F.2d 733, 743 (5th Cir.

---

[4] Decisions issued by the Fifth Circuit prior to September 30, 1981 are binding on the present-day Eleventh Circuit courts. *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206 (11th Cir. 1981).

1963). Thus, for example, *Atkins* held that "the Board [can]not deprive a person of the right to register to vote on the basis of secret evidence without affording notice and an opportunity for hearing." *Id.* Several courts have also recognized that the "right to vote . . . implicates a liberty interest protected by the Due Process Clause of the Fourteenth Amendment." *Miller v. Blackwell*, 348 F. Supp. 2d 916, 921 (S.D. Ohio 2004); *see also, e.g.*, *Bell v. Marinko*, 235 F. Supp. 2d 772, 777 (N.D. Ohio 2002) (citing cases, including signature matching cases). As for the second element, Defendants cannot dispute that the statute requires state action.

Where, as here, the first two elements are satisfied, "the question becomes what process is due." *Grayden v. Rhodes*, 345 F.3d 1225 (11th Cir. 2003). To make that determination, courts use the test from *Mathews v. Eldridge*, which requires the balancing of the following considerations:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probative value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. 319, 335 (1976); *see Hansen I*, 736 F.3d at 966.

The Eleventh Circuit has also set out the standard for assessing facial procedural due process challenges. Where, as here, plaintiffs argue that a statute

lacks adequate due process on its face, courts "look[] to the statute as written to determine whether the procedure provided comports with due process. [Courts do not] simply rely on the defendant's description of how the statute operates in practice." *Hansen I*, 736 F.3d at 966.

## A.   The Private Interest Affected Is of Paramount Importance

The private interest affected by the challenged statute is of paramount importance because the rejection of a voter's absentee ballot implicates that individual's very right to participate in our democracy. The right to vote has been ranked by the Supreme Court as the most "precious" of all rights because it is "preservative of all rights." *Yick Wo v. Hopkins*, 18 U.S. 356, 370 (1886); *Atkins*, 323 F.2d at 743 ("The right to vote is one of the most important and powerful privileges which our democratic form of government has to offer."). This first *Mathews* factor thus weighs strongly in Plaintiffs' favor. *See Saucedo v. Gardner*, No. 17-cv-183-LM, 2018 WL 3862704, at *10 (D.N.H. Aug. 14, 2018) (giving factor "significant weight" in striking down signature matching requirement).

**B.      The Risk of Erroneous Removal Is Substantial, and Applying the
Same Safeguards for Other Absentee Voters Can Significantly
Reduce that Risk**

The next *Mathews* factor examines "the risk of an erroneous deprivation of

such interest through the procedures used, and the probative value, if any, of

additional or substitute procedural safeguards." *Mathews*, 424 U.S. at 335.

> 1.   *The risk of a voter's absentee ballot being erroneously rejected is
> substantial*

The risk of a voter's absentee ballot being erroneously rejected is

substantial, for multiple reasons.

***First***, O.C.G.A. § 21-2-2386(a)(1)(B)-(C) permits a single registrar to

unilaterally reject absentee ballots solely based on a subjective, standardless

determination of a signature mismatch without any check on that process. Voters

are provided no pre-rejection notice or adversarial opportunity to challenge the

rejection, creating a high risk of error. *See, e.g.*, *Catron v. City of St. Petersburg*,

658 F.3d 1260, 1267 (11th Cir. 2011) (facially unconstitutional "trespass ordinance

causes a substantial risk of erroneous deprivation of liberty because it is seemingly

easy for the City . . . to issue a trespass warning and because no procedure is

provided for the recipient of a trespass warning to challenge the warning or for the

warning to be rescinded."); *Saucedo*, 2018 WL 3862704, at *11 (similar signature-

matching requirement creates high risk of disenfranchisement where there is no

12

opportunity to "object to a determination" or any "appeal or review process"); *Doe v. Rowe*, 156 F. Supp. 2d 35, 48 (D. Me. 2001) (disenfranchising "mentally ill" persons without notice or opportunity to be heard created a "high risk" of error).

There are also no audit procedures or review processes to determine whether a county registrar's unilateral determinations are correct, further exacerbating the risk. *See, e.g.*, *J.R. v. Hansen*, 803 F.3d 1315, 1324-25 (11th Cir. 2015) (civil detention statute "constitutionally infirm [on its face] because it does not require periodic review of continued involuntary commitment" to determine whether the bases for detention continue to hold). Even statutory schemes with judicial backstops have been found not to mitigate the risk of error. *See id.* at 1326 (habeas corpus backstop insufficient). Here, there is no judicial backstop at all.

In a case challenging a similar signature-matching procedure, the federal district court found an unacceptably high risk of disenfranchisement for these same reasons. *See Saucedo*, 2018 WL 3862704, at *11-13.

***Second***, the statute forces untrained laypersons to become handwriting experts. Entrusting laypersons to conduct a task that only experts can do is inherently risky. *See id.* at *11 ("the task of handwriting analysis by laypersons . . . is fraught with error").

***Third***, the statute vests registrars with virtually limitless discretion to determine whether two signatures match. Georgia law and regulations provide no guidance on how county registrars are to determine a match. Such expansive discretion is bound to contain a high risk of error. *See, e.g.*, *Catron*, 658 F.3d at 1267 (facially unconstitutional ordinance "provides a lot of discretion to many different city agents to issue trespass warnings for a wide range of acts"); *LULAC of Iowa v. Pate*, No. CVCV056403 (Iowa Dist. Ct. July 24, 2018) (Exhibit C), at 18 (stating that "there is potential for erroneous determinations of a mismatch" under Iowa signature-match requirement for absentee ballots, where election officials had "unbridled discretion to reject ballots based on signatures they find do not match," but did not have "official guidance or handwriting expertise") *aff'd in part*, No. 18-1276, 2018 WL 3946147 (Iowa Aug. 10, 2018).

***Fourth***, existing cure opportunities do not adequately mitigate the risk of erroneous deprivation. Though affected voters are theoretically permitted to "cure" their ballot rejection by trying to successfully navigate the absentee voting process a second time or voting in-person, Ga. Admin. Code § 183-1-14-.09(2), this cure opportunity is illusory for many would-be voters. Even for voters willing and able to try the absentee process again, there is no reason to believe that a voter's signature will be found to match on a second try. In-person voting is denied to

absentee voters who cannot vote in-person, whether because of physical disability, lack of transportation, or out-of-town travel. It is also denied to the many voters do not receive notice of their rejection until on or after Election Day, when it is too late to vote in-person to cure the error. *See LULAC of Iowa v. Pate*, No. CVCV056403 at 8 (Iowa Dist. Ct. July 24, 2018) (Exhibit C) ("Voters whose ballots are erroneously deemed defective under the signature matching provision . . . will be harmed" due to additional obstacles and late rejections). Because the law fails to provide any time frame for when absentee ballots must be processed after they are received, nor a time limit as to when county officials must send notices of rejection, would-be voters who are disenfranchised include not just those who cast absentee ballots near Election Day, but also some who cast ballots well in advance of Election Day.

*Fifth*, the risk of erroneous rejection is high because the same person can have different signatures for any number of innocent reasons. "[I]nnocent factors— such as body position, writing surface, and noise—affect the accuracy of one's signature." *Fla. Democratic Party v. Detzner*, No. 4:16cv607-MW/CAS, 2016 WL 6090943, at *7 (N.D. Fla. Oct. 16, 2016). Unintentional factors include "age, physical and mental condition, disability, medication, stress, accidents, and inherent differences in a person's neuromuscular coordination and stance."

*Saucedo*, 2018 WL 3862704, at *1. "Variations are more prevalent in people who are elderly, disabled, or who speak English as a second language." *Id.* The current procedure fails to account for these common deviations.

All these factors combine to create a substantial risk of erroneous rejection. *See Saucedo*, 2018 WL 3862704, at *12 ("The natural variations in a person's handwriting—many of which are unintentional or uncontrollable, like mental or physical condition—when combined with the absence of functional standards, training, review, and oversight, create a tangible risk of erroneous deprivation.).

2. *The probative value of additional procedural safeguards is significant*

In addition to the risk of erroneous deprivation under the current process, the second *Mathews* factor examines the probative value of additional procedural safeguards, and here, the value is significant. The substantial risk of error would be be greatly reduced if absentee voters were given basic pre-rejection notice and an opportunity to contest the rejection. Voters could, for example, be permitted to confirm their identity through some form of identification, or otherwise resolve the alleged signature discrepancy with extrinsic evidence or other explanation, perhaps even by phone call. *See, e.g.*, *Grayden*, 345 F.3d at 1236 ("there is at least some value in conducting a hearing at which tenants can challenge a condemnation order"); *Saucedo*, 2018 WL 3862704, at *12 ("a procedure where by a moderator

16

simply reaches out to the voter in one form or another would be of great value," even if it is not a "perfect solution").

Courts adjudicating challenges to similar signature-matching procedures in other states have found such simple procedural safeguards to add significant probative value, even where the risk of an erroneous rejection was "not enormous." *See Zessar v. Helander*, No. 05 C 1917, 2006 WL 642646, at *9 (N.D. Ill. Mar. 13, 2006) (risk of erroneous deprivation "not enormous, but the probable value of an additional procedure is likewise great in that it serves to protect the fundamental right to vote."); *Saucedo*, 2018 WL 3862704, at *13 (same). And if county registrars still find that the signatures do not match, an appeal to the Georgia superior court can provide a neutral mechanism for resolving those disputes. *See, e.g.*, *Parham v. J.R.*, 442 U.S. 584, 606-07 (1979) ("some kind of inquiry should be made by a 'neutral factfinder'" to determine validity of detention).

The second *Mathews* factor thus weighs heavily in favor of Plaintiffs.

### C. Additional Procedures Involve Minimal Administrative Burdens Because They Already Exist

The last *Mathews* factor examines "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335.

The State's interests would not be not harmed by the additional procedures requested. In fact, the additional procedures Plaintiffs seek would only help to better serve the State's interest in ensuring that no absentee ballot is erroneously rejected. Nor would additional procedures increase the potential for voter fraud, since additional procedures would not remove any of the identification requirements of Georgia law, and instead would simply ensure that voters have an opportunity to confirm their identity. *See, e.g.*, *Saucedo*, 2018 WL 3862704, at *13 ("additional procedures further the State's interest in preventing voter fraud while ensuring that qualified voters are not wrongly disenfranchised . . . [and] only serve to enhance voter confidence in elections").

The administrative burdens entailed by pre-rejection notice and an opportunity to be heard are "negligible," for the same reasons provided by the Eleventh Circuit in *Grayden*, 345 F.3d at 1236. Pre-rejection notice costs nothing extra since the statute already requires post-rejection notice; it is simply a matter of updating the notice language. *See id.* at 1237 (requiring pre-deprivation notice instead of post-deprivation notice adds "little extra cost"); *id.* at 1236 ("To include a one-sentence statement of a tenant's right to appeal the condemnation order in this notice to vacate would not be burdensome."). An opportunity to be heard also

imposes minimal burdens. *See id.* (summarily concluding that "[t]he burden of conducting a hearing" is "hardly daunting").

The burdens are especially low considering Georgia already has in place a system that provides pre-rejection notice and an opportunity to be heard, and judicial review, for other absentee voters, whose ballots are challenged on the basis of voter ineligibility. *See* O.C.G.A. § 21-2-230(g) ("If the challenged elector cast an absentee ballot and the challenge is based upon grounds that the challenged elector is not qualified to remain on the list of electors, the board of registrars shall proceed to conduct a hearing on the challenge on an expedited basis prior to the certification of the consolidated returns"); *id.* ("The elector making the challenge and the challenged elector may appeal the decision of the registrars in the same manner as provided in [O.C.G.A. § 21-2-229(e)]"); O.C.G.A. § 21-2-229(e) (appeal to be filed with the clerk of superior court). This existing procedure may take place up to 6 days after Election Day, or even beyond.[5]

--------

[5] *See* O.C.G.A. § 21-2-230(g) (challenge hearings conducted up to date of certification of consolidated returns by election superintendent); O.C.G.A. § 21-2-493(k) (consolidated return certification occurs by Monday after Election Day); *but see* O.C.G.A. § 21-2-230(g) (consolidated returns may not be certified by election superintendent until challenges are resolved).

Given that the procedures Plaintiffs request are already provided to other absentee voters, extending the same process to absentee voters whose ballots are challenged on the basis of an alleged signature match would not be burdensome. *See, e.g.*, *Zinermon v. Burch*, 494 U.S. 113, 137 (1990) ("we cannot say that predeprivation process was impossible" where state "already has an established procedure"); *Saucedo*, 2018 WL 3862704, at *14 ("this is a case not of foisting wholly novel procedures on state election officials, but of simply refining an existing one . . . . [P]rocedures already exist which could be readily extended to provide basic guarantees of due process to voters . . . ."); *Fla. Democratic Party v. Detzner*, No. 4:16cv607-MW/CAS, 2016 WL 6090943, at *8 (N.D. Fla. Oct. 16, 2016) ("there is no rational explanation for why it would impose a severe hardship on Defendant to provide the same procedure for curing mismatched-signature ballots as for no-signature ballots").

In addition, Plaintiffs ask that absentee voters whose ballots are rejected be given up to 3 days after Election Day, or 3 days after receipt of pre-rejection notice, whichever is later, to resolve the discrepancy by, for example, sending a copy of identification (provided through e-mail, fax, mail, or in-person) confirming the voter's identity. This suggested relief is modelled after O.C.G.A. § 21-2-417, Georgia's voter ID law. The only purpose that Georgia's signature match

requirement serves is to verify a voter's identity. Presenting photo identification at the polls serves a similar purpose for voters who vote in-person, and under the voter ID law, in-person voters have until 3 days after Election Day to confirm their identity if they failed to provide photo identification at the polls.[6] There is no reason absentee voters should not likewise have at least until 3 days after Election Day (or 3 days after receipt of pre-rejection notice, if later) to resolve any concerns about their identity.

For these reasons, the third *Mathews* factor also weighs in Plaintiffs' favor.

\*       \*       \*

"For more than a century the central meaning of procedural due process has been clear: Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified." *Wilkinson v. Austin*, 545 U.S. 209, 226 (2005) (citations and quotations omitted). For this reason, numerous courts have struck down signature matching requirements that fail to provide due process. *See, e.g.*, *Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. supp. 1354 (D. Ariz. 1990); *LULAC of Iowa v. Pate*, No. CVCV056403

------

[6] Absentee voters are exempt from the voter ID requirement, unless the voter registered by mail without including ID and is voting for the first time. *See Common Cause / Georgia v. Billups*, 554 F.3d 1340, 1346 (11th Cir. 2009).

(Iowa Dist. Ct. July 24, 2018) (Exhibit C); *La Follette v. Padilla*, No. CPF-17-515931 (Cal. Super. Ct. Mar. 5, 2018) (Exhibit D). This principle readily applies here, where all three *Mathews* factors point in Plaintiffs' favor. Absentee voters whose ballots are rejected based on a signature mismatch deserve the same pre-rejection notice and opportunity to be heard that Georgia law already provides to other absentee voters whose ballots are challenged on other grounds.

Given the importance of the right at stake, even if the risk of error were low—which is not the case here—the probative value of providing pre-rejection notice and an opportunity to be heard far outweigh the negligible burden to the State of requiring those minimal procedures. *See, e.g.*, *Grayden*, 345 F.3d at 1236 (violation of due process where "the risk of erroneous deprivation is relatively low," but where pre-deprivation notice and an opportunity to be heard is probative and involves "almost no additional financial or administrative burden"); *Saucedo*, 2018 WL 3862704, at *13-*14 (violation of due process even where "risk of erroneous deprivation . . . is not enormous," because where the additional procedures have "great" probative value and "would not entail significant administrative burdens" (citation omitted)); *Zessar*, 2006 WL 642646, at *9 (same).

Plaintiffs are thus substantially likely to succeed on their procedural due

process challenge against O.C.G.A. § 21-2-386(a)(1)(B)-(C) (Count One).

## II. PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO SUCCEED ON THE MERITS OF COUNT TWO'S PROCEDURAL DUE PROCESS CHALLENGE

For the same reasons, Plaintiffs are also substantially likely to succeed on

the merits of Count One's procedural due process challenge to O.C.G.A. § 21-2-

381(b)(1)-(3), which similarly mandates the rejection of absentee ballots

*applications* when an elections official subjectively determines that the voter's

signatures do not match, without pre-rejection notice or an opportunity to be heard.

Plaintiffs ask that the same remedy articulated above also be applied to absentee

ballot applications, except that any opportunity to be heard would end the Friday

before Election Day, which is the last day that absentee ballot applications are due.

## III. THE REMAINING TEMPORARY RESTRAINING ORDER FACTORS WEIGH IN PLAINTIFFS' FAVOR

The remaining factors to be considered on a TRO motion are also satisfied

here. "A restriction on the fundamental right to vote . . . constitutes irreparable

injury." *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012); *Detzner*,

2016 WL 6090943, at *8. Monetary damages cannot compensate for the loss of the

priceless right to vote, especially when elections have come and gone. *League of*

*Women Voters of N. Carolina v. N. Carolina*, 769 F.3d 224, 247 (4th Cir. 2014)

("Courts routinely deem restrictions on fundamental voting rights irreparable injury" because "once [an] election occurs, there can be no do-over and no redress."). Hundreds of absentee ballots or applications have already been rejected, and the rate of disenfranchisement increases with each passing day that emergency relief is not ordered.

The balance of hardships favors Plaintiffs because the opportunity to correct an erroneous rejection substantially outweighs the minimal burdens involved in extending existing procedures to absentee voters whose ballots and/or ballot applications are identified as allegedly having signature mismatches. *See Obama for Am.*, 697 F.3d 423 at 436; *Detzner*, 2016 WL 6090943, at *8; *see also LWV of N. Carolina*, 769 F.3d at 244 (potential disenfranchisement "outweighs any corresponding burden on the State, which has not show that [it] will be unable to cope" with plaintiffs' requested relief). It is also unquestionably in the public's interest to ensure that no absentee ballots are erroneously rejected. *See Obama for Am.*, 697 F.3d at 436; *Detzner*, 2016 WL 6090943, at *8. Indeed, "[t]he public interest . . . favors permitting as many qualified voters to vote as possible." *Obama for Am.*, 697 F.3d at 437.

For these reasons, this Court should enter the relief detailed in Plaintiffs' accompanying motion for a TRO and proposed order.

## CONCLUSION

Absentee voters are entitled to due process before their right to vote is stripped away. For the reasons stated above, this Court should enter a temporary restraining order entering the relief detailed in Plaintiffs' accompanying motion for a TRO and proposed order.

Respectfully submitted,

this 17th of October, 2018        s/ Sean J. Young_____

Sean J. Young (Ga. Bar No. 790399)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF GEORGIA, INC.
P.O. Box 77208
Atlanta, GA 30357
770-303-8111 (phone)
770-303-0060 (fax)
syoung@acluga.org

Sophia Lin Lakin*
Dale E. Ho*
AMERICAN CIVIL LIBERTIES UNION
125 Broad Street, 18th Floor
New York, NY 10004
212-519-7836 (phone)
slakin@aclu.org
dho@aclu.org

Attorneys for Plaintiffs

*Pro hac vice application forthcoming

25

## CERTIFICATE OF SERVICE

I hereby certify that on October 17, 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system. On October 16, I e-mailed a copy of the Complaint to the general counsel for the Secretary of State's Office, Ryan Germany (rgermany@sos.ga.gov), as well as the head of the Law Department for Gwinnett County, William J. Linkous III (William.linkous@gwinnettcounty.com). Mr. Linkous replied by e-mail on October 16 discussing the possibility of waiver of service, thus confirming that he received the e-mail. Mr. Germany replied by e-mail on October 17 discussing the mechanics of formal service, thus confirming that he received the e-mail as well. An attorney from the State Attorney General's Office, Cris Correia (ccorreia@law.ga.gov), who was CC'd by Mr. Germany, also responded on October 17 asking that I e-mail a copy of the TRO papers to her as soon as I file them. I then hired a process server to formally serve the Complaint, the Motion for a Temporary Restraining Order and related filings on Defendants. Immediately upon filing this motion, I will e-mail a copy of the TRO papers to Mr. Germany, Ms. Correia, and Mr. Linkous, followed by a phone call to Ms. Correia and Mr. Linkous alerting them to the filing and the e-mail. I will also mail copies of the Complaint and TRO papers via same-day delivery or, if it is too late, next-day

delivery to Mr. Linkous at 75 Langley Drive, Lawrenceville, GA 30046 and to Ms.

Correia at 40 Capitol Square SW, Atlanta, GA 30334.

Date: October 17, 2018

s/ Sean J. Young_____

Sean J. Young (Ga. Bar No. 790399)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF GEORGIA, INC.
P.O. Box 77208
Atlanta, GA 30357
770-303-8111 (phone)
770-303-0060 (fax)
syoung@acluga.org