## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| GEORGIA MUSLIM VOTER PROJECT and ASIAN-AMERICANS ADVANCING JUSTICE-ATLANTA, <br><br>     Plaintiffs, <br><br> vs. <br><br> BRIAN KEMP, in his official capacity as the Secretary of State of Georgia; and GWINNETT COUNTY BOARD OF VOTER REGISTRATION AND ELECTIONS, on behalf of itself and similarly situated boards of registrars in all 159 counties in Georgia, <br><br>     Defendants. | Civil Action No.: 1:18-cv-04789-LMM |

## DEFENDANT GWINNETT COUNTY BOARD OF REGISTRATIONS AND ELECTIONS'[1] RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER[2]

After the forty-five-day period for absentee-by-mail voting was more than

two-thirds complete, Plaintiffs filed this lawsuit, alleging that the statutory

requirements for processing absentee ballot applications and absentee ballots—

---

[1] The Complaint [Doc. 1] incorrectly identifies the Gwinnett County Board of Registration and Elections as the "Gwinnett County Board of Voter Registration and Elections." This pleading uses the correct name of the Board.

[2] This Court required Defendants' responses to Plaintiffs' Motion be expedited and filed no later than noon on Monday, October 22, 2018 [Doc. 6].

enacted long ago and in use for many years—violate the U.S. Constitution. Plaintiffs' request that the Court change the rules in the middle of the election should be denied on several grounds.

Most importantly, Plaintiffs have not shown they have an injury sufficient to confer jurisdiction on this Court. That deficiency alone requires denial of their motion for lack of standing.

If the Court considers issues other than standing, the motion should still be denied. Although Plaintiffs apparently do not seek an injunction against the Gwinnett County Board of Registrations and Elections ("Gwinnett BORE"), their inclusion of class action allegations in the Complaint implies that, to the extent the Court determines any injunction would be against election officials in the state's 159 counties, Plaintiffs want the Gwinnett BORE to serve as the "class" representative. As discussed below, the Gwinnett BORE is in no way a proper class representative because there are no questions common to a class and the Gwinnett BORE has no knowledge of the interests or defenses of the other purported class members.

Furthermore, Plaintiffs only moved for injunctive relief on their claim that the statutes are facially unconstitutional. But they have not demonstrated that they

will succeed on that claim and, in fact, suggest ways that they think the statutes can be constitutionally applied.

Finally, Plaintiffs' requested injunction is not in the public interest. Their unexplained delay in bringing this action until the process they complain of was well underway means that the significant changes they propose would treat absentee voters differently and cause unnecessary voter confusion.

## FACTUAL BACKGROUND

### I. Absentee balloting in Georgia.

The history of Georgia's absentee balloting process is intertwined with its in-person voting process. For more than a decade, Georgia law has required voters to present photo identification when voting in person. O.C.G.A. § 21-2-417. When that law was challenged, the Eleventh Circuit upheld the law due to the state's interest in preventing voter fraud and ensuring the integrity of the election process. *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1353-55 (11th Cir. 2009). When Georgia first implemented the photo identification requirement, it also eliminated its prior requirement that voters seeking an absentee ballot by mail provide a specific reason for doing so. *Id*. at 1346; *see also Spalding County Bd. of Elections v. McCord*, 287 Ga. 835, 835-841 (2010) (explaining statutory changes to absentee ballot laws from 1964 to 2010). Georgia now allows all voters to

request an absentee ballot by mail without a reason for doing so. O.C.G.A. § 21-2-380.

Historically, absentee ballots by mail and the voter registration process have been major vehicles through which election fraud has been committed. *Crawford v. Marion Cty. Election Bd*., 553 U.S. 181, 225, 128 S. Ct. 1610, 1636 (2008) (Souter, J., dissenting); Prof. Richard Hasen, *Exorcising the voter fraud ghost*, REUTERS, April 30, 2014, http://blogs.reuters.com/great-debate/2014/04/30/exorcising-the-voter-fraud-ghost/ ("it is easy to find cases throughout the country every year of fraud or attempted fraud with absentee ballots"); *see also* Greg Bluestein, *Records: City Hall staffer claims voter fraud in 2017 election*, ATLANTA JOURNAL-CONSTITUTION, June 28, 2018, https://www.ajc.com/news/state--regional-govt--politics/records-city-hall-staffer-claims-voter-fraud-2017-election/cPuLPgrSfBpjlyFdlCxRJK/ (allegations related to absentee ballot fraud); Anna Tinsley & Deanna Boyd, *Four women in 'voter fraud ring' arrested. They targeted seniors on city's north side*, FORT WORTH STAR-TELEGRAM, October 12, 2018, https://www.star-telegram.com/news/local/community/fort-worth/article219920740.html (arrests for absentee ballot fraud).

This problem has also existed to some extent in Gwinnett County elections. In 2012, Gwinnett BORE Director Lynn Ledford rejected an absentee ballot because the signature did not match the signature on file for a voter. Declaration of Lynn Ledford, attached as Ex. A at ¶ 5 ("Ledford Dec."). The State Election Board pursued the case and determined that the voter died, and his son voted the ballot for the dead voter, signing the oath on the absentee ballot's outer envelope. *Id*. Because the signatures did not match, the issue was discovered, the vote was not counted, and the matter was referred to the Attorney General. *Id*.

## II. The application process for an absentee ballot.

Unlike in-person voting, no other identification method is available for mailed ballots, so Georgia law requires a two-part match of the voter's signature, along with the provision of identifying information. O.C.G.A. § 21-2-381(b)(1). The first signature match takes place after a voter submits an absentee ballot application that is "in writing and shall contain sufficient information for proper identification of the elector." O.C.G.A. § 21-2-381(a)(1)(C). The application must also include the address to which the absentee ballot is to be mailed, the election in which the elector wishes to vote, and the name and relationship of the person requesting the ballot if the request is made by someone other than the elector. *Id*.

### III. Verification of absentee ballot applications in Gwinnett County.

When an absentee ballot application arrives in the Gwinnett BORE office, staff of the Gwinnett BORE reviews the applications. Ledford Dec. at ¶¶ 7-8. No voter history information is available to staff without taking additional steps when reviewing an absentee ballot application. Ledford Dec. at ¶ 9.

One of three things happens to the application after its review by staff:

(1) if the voter's signature on the application matches the signature on file and all other information is included, the voter is sent an absentee ballot by mail. O.C.G.A. § 21-2-381(b)(2)(A). In Gwinnett County, ballots are mailed within three days of approval of the application. Ledford Dec. at ¶ 8;

(2) if required information is missing or the signature obviously does not match the voter registration records, the staff rejects the application and sends the voter a letter within three days explaining why the application was rejected, including instructions on how to vote in-person or to reapply for an absentee ballot, along with a new application for an absentee ballot. Ledford Dec. at ¶ 7; or

(3) if the required information is included, but staff have a question about whether the signature on the application matches the registration records, staff sends the questioned application to Director Ledford for review. Ledford Dec. at ¶¶ 7, 15. If Director Ledford is unable to determine whether the signature matches,

she assembles a group of three staff members to review the signatures: herself and two other senior staff. *Id*. A majority vote of that group determines whether the application is approved. *Id*.

If the voter's application is rejected, the voter must be "promptly" notified of the rejection. O.C.G.A. § 21-2-381(b)(3). In Gwinnett County, voters are notified by first-class mail within three days of the rejection and given instructions about in-person voting and reapplying for an absentee ballot, along with a new application to fill out if they wish to do so. Ledford Dec. at ¶ 7.

Through last Thursday, October 18, the Gwinnett BORE has rejected a total of 713 absentee ballot applications for the 2018 general election. Ledford Dec. at ¶ 10. Those rejections were for the following reasons:

- 185 applications because of signature mismatch;

- 437 applications because required information was missing;

- 7 applications because the elector was found to be disqualified; and

- 84 applications because the elector chose to vote in person.

Ledford Dec. at ¶ 10.

Gwinnett mailed its first absentee ballots to voters on September 21, 2018, which is 45 days from Election Day. O.C.G.A. § 21-2-384(a)(2); Ledford Dec. at ¶ 11. Absentee ballots cannot be mailed to voters after the Friday before Election

Day. O.C.G.A. § 21-2-384(a)(2). As a result, the deadline for absentee ballots to be mailed for the 2018 general election is November 2, 2018 (11 days from the filing of this brief). *Id*.

**IV. The verification of absentee ballots.**

After a voter completes his or her absentee ballot, the voter places the ballot into an envelope ("the inner envelope"). That envelope is then placed into a larger envelope which has the statutory oath and information about the voter printed on the outside ("the outer envelope"). O.C.G.A. §§ 21-2-385(a), 21-2-384(c)(1). The voter mails this envelope containing the ballot back to the registrar for processing. *Id*.

When the registrar or clerk receives the ballot back from the voter, he or she must take several immediate steps to verify the validity of the ballot:

- The registrar must write the date and hour of receipt on the envelope, O.C.G.A. § 21-2-386(a)(1)(B);

- The registrar must compare the identifying information about the voter on the outer envelope to the records on file, *id*.;

- The registrar must compare the signature or mark on the outer envelope to the voter's record on file, *id*.; and

- The registrar must compare the signature or mark on the outer envelope to the application the voter signed to request the absentee ballot, *id*.

If all of the information in the verifying process matches and the voter's information is correct, the registrar then signs his or her name, places the sealed envelope in a secure location, and adds that voter to the numbered list of absentee voters. *Id*. The outer envelope with the oath cannot be opened until the day of the election. O.C.G.A. 21-2-386(a)(2).

If the voter fails to sign the oath, if any of the information on the outer envelope is missing, or if the signature does not match, the registrar is required by statute to write "Rejected" on the envelope and state the reason. O.C.G.A. § 21-2-386(a)(1)(C). The board is then required to promptly notify the voter of that rejection. *Id*.

**V. Verification of absentee ballots in Gwinnett County.**

In Gwinnett County, staff of the Gwinnett BORE reviews the outer envelopes as they arrive, using a longstanding process. Ledford Dec. at ¶ 12. No race or partisan data is displayed when staff of the Gwinnett BORE reviews the signatures and other information on the outer envelope. Ledford Dec. at ¶ 12. One of three things happens to the ballot after its review by staff:

(1) if all the required information is included and the staff concludes the signatures match, the ballot is approved and placed in the appropriate secured location to await its opening on Election Day. Ledford Dec. at ¶ 13;

(2) if the voter fails to sign the oath or fails to include all the required information, staff rejects the ballot pursuant to O.C.G.A. § 21-2-386(a)(1)(C) and sends the voter a letter within three days explaining why the ballot was rejected, including instructions on how to vote in-person or to reapply for an absentee ballot, along with a new application for an absentee ballot. Ledford Dec. at ¶ 14; or

(3) if the oath is signed and the required information is included, but the signatures do not appear to match either the application or registration records, staff sends the questioned envelope to Director Ledford for review. Ledford Dec. at ¶ 15. If Director Ledford is unable to determine whether the signature matches, she assembles a group of three staff members to review the signatures: herself and two other senior staff members. *Id*. A majority vote of that group determines whether the ballot is certified. *Id*.

Unlike other counties, Gwinnett enters *all* information related to the processing of absentee ballots into the Secretary of State's ENET tracking system, which updates the voter's My Voter Page; that way, the voter gets status updates on his or her absentee ballot. Ledford Dec. at ¶ 16.

Through Thursday, October 18, Gwinnett BORE has rejected a total of 524 absentee ballots for the 2018 general election. Ledford Dec. at ¶ 18. Those rejections were for the following reasons:

- 9 ballots because of signature mismatch;

- 209 ballots because the oath was not signed;

- 306 ballots because required information was missing;

Ledford Dec. at ¶ 18. In addition, 253 ballots have been cancelled because the voter chose to vote in person. *Id*. Redacted copies of the voter signatures for the nine ballots that were rejected for signature mismatches are attached to the Ledford Dec. as Exs. 1-9.

Gwinnett BORE staff are trained in the processes outlined above and have already processed more than 22,703 absentee ballot applications and 7,046 absentee ballots. Ledford Dec. at ¶ 19. Requiring another review or further new procedures at this point in the process will require taking workers who are stretched to the limit with required election-related tasks to repeat their review of absentee ballot applications and absentee ballots. Ledford Dec. at ¶¶ 20-21. Notifying voters who have already resubmitted a new application or ballot that was previously rejected could lead to voter confusion and additional staff time trying to update voters about the processes. Ledford Dec., at ¶ 22.

## ARGUMENT AND CITATION OF AUTHORITY

Because temporary restraining orders and preliminary injunctions are such extraordinary and drastic remedies, courts may not grant this type of relief "unless the movant clearly established the 'burden of persuasion' as to the four requisites." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998) quoting *All Care Nursing Service, Inc. v. Bethesda Memorial Hospital, Inc*., 887 F.2d 1535, 1537 (11th Cir.1989). Plaintiffs must demonstrate: (1) they have a substantial likelihood of success on the merits of their claims; (2) they will likely suffer irreparable harm in the absence of an injunction; (3) that the balance of equities tips in Plaintiffs' favor; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20, 129 S. Ct. 365, 374 (2008).

Preliminary injunctions are never granted as of right, even if a plaintiff can show a likelihood of success on the merits. *Benisek v. Lamone*, ___ U.S. ___, 138 S. Ct. 1942, 1943–44 (2018). And the extraordinary nature of the relief sought by Plaintiffs is heightened in the context of elections, because of the public interest in orderly elections and the integrity of the election process. *Purcell v. Gonzalez*, 549 U.S. 1, 4-5, 127 S.Ct. 5 (2006).

Further and particularly important here is the U.S. Supreme Court's recognition that when "an impending election is imminent and a State's election

machinery is already in progress," equitable considerations justify a court denying

an attempt to gain immediate relief—even after an elections practice was found

unconstitutional. *Reynolds v. Sims*, 377 U.S. 533, 585 (1964). This is because

parties must show they exercised reasonable diligence to obtain a preliminary

injunction, especially in the context of elections. *Benisek*, 138 S.Ct. at 1944.

Plaintiffs here are not entitled to the temporary restraining order or

preliminary injunction they seek because they have not shown they have standing

to pursue these claims, nor have they shown that the statutes challenged cannot be

constitutionally applied. Injunctive relief is also not in the interest of the public at

this stage of the election process, because Plaintiffs waited until the six-week

absentee ballot process had been underway for nearly a month before filing this

lawsuit challenging statutes that have been in place for many years. They have not

identified a single voter who has been denied the right to vote as a result of the

processes the Gwinnett BORE has consistently followed, but instead rely on

speculative harms.

## I. JURISDICTIONAL ISSUES.

*A. Plaintiffs have not shown an imminent injury sufficient to have standing to pursue this temporary restraining order.*

Article III standing requires that a claimed injury be "concrete,

particularized, and actual or imminent; fairly traceable to the challenged action;

and redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149, 130 S. Ct. 2743, 2752 (2010). Plaintiffs' sole claim to standing is that they are required to divert their resources to warning voters about the potential risks they allege. [Doc. 1, ¶¶ 12-13], [Doc. 5-2], [Doc. 5-3]. While this kind of claimed injury can form the basis for standing, *Common Cause/Georgia*, 554 F.3d at 1350-51, Plaintiffs must present some evidence about what resources they will have to divert and how diversion constitutes the harm they allege.

### 1. Plaintiffs' mere allegations about diversion of resources are not sufficient to establish standing.

As outlined in their nearly identical declarations, the representatives of each of the Plaintiff organizations claim that they will have to make three changes as a result of existing Georgia statutes: (1) "warn" voters about signature matching; (2) make phone calls to registrars; and (3) facilitate more in-person voting. [Doc. 5-2, ¶¶ 3-4], [Doc. 5-3, ¶¶ 4-5]. But Plaintiffs have not explained how those activities differ from what they categorize as their "regular voting and voter registration activities"[3] in which their organizations already engage. [Doc. 5-2, ¶5], [Doc. 5-3, ¶5].

---

[3] Diversion of resources from registration efforts is not at issue here because registration for the upcoming election has ended. Ledford Dec. at ¶ 6.

In *Common Cause/Georgia*, the Eleventh Circuit found an organizational plaintiff had standing to challenge Georgia's photo identification law because plaintiffs presented evidence related to costs it incurred that were separate from its mission. The NAACP presented evidence that it had to stop its efforts to get voters to the polls (part of its organizational mission) and instead help voters obtain photo identification because of the change in Georgia law. *Common Cause/Georgia*, 554 F.3d at 1350. Those are clearly different efforts, with the latter being undertaken as a result of a change in the law, not as a result of existing law.

But Plaintiffs do not explain how "warning voters" about a perceived risk, "placing calls to county registrars" or "facilitating in-person voting" is different from normal activities related to voting—especially when there has been no change in how the Gwinnett BORE handles absentee ballots and no change in state law. Plaintiffs allege that they have to change their behavior when the law they claim is the basis for that change in the 2018 general election has been in place for at least 15 years (and likely much longer) and somehow did not change their behavior in any prior election—including this year's primary elections. *See* 2003 GA. LAWS Act 209 and 2005 GA. LAWS 2005.

But even if Plaintiffs could give a good reason for their alleged diversion of resources for the last 11 days of absentee voting, Plaintiffs' harm must also be

"redressable by a favorable ruling" to confer standing. *Monsanto Co.*, 561 U.S.at

149. Even if this Court were to enter an injunction in favor of Plaintiffs, they have

not shown how that solves their diversion problem—if anything, Plaintiffs would

have to expend *even more* resources notifying voters of the new procedures put in

place by an injunction and following up with voters. The fact that the harm alleged

by Plaintiffs is not remedied by a favorable ruling further demonstrates that they

lack standing to assert these claims. Plaintiffs seek to change the status quo with

their proposed injunction, not preserve it.

        2. Plaintiffs lack standing because their alleged injury is not imminent.

Despite all their dire warnings about a "constitutional train wreck," Plaintiffs

have not identified a single voter who has had an absentee ballot application or

absentee ballot rejected based on an improper signature match by the Gwinnett

BORE or any other elections official and, as a result, has been unable to vote.

An alleged injury must be impending to constitute an injury in fact. *Clapper*

*v. Amnesty Intern. USA*, 568 U.S. 398, 409, 133 S.Ct. 1138 (2013). While Plaintiffs

claim they changed their behavior based on the statute, the decision upon which

they base that claim is too speculative because a mere allegation of possible future

injury is not sufficient to confer standing. *Id*. Under Plaintiffs' approach, *if* a voter

requests an absentee ballot, and *if* the voter signs in a way different than that on

their application and registration information, and *if* the voter returns the ballot on the deadline, and *if* the staff of Gwinnett BORE determine that the signature does not match, and *if* the voter does not get notice in time to remedy the matter or vote another way, then the ballot will be rejected, and the voter's vote will not count.[4]

As a result of this *possible* chain of events, Plaintiffs claim they must act in the next 11 days to divert resources. Without further evidence or a single voter that has suffered this kind of imagined harm, such harm is simply in the realm of speculation and conjecture. *See Whitmore v. Arkansas*, 495 U.S. 149, 158-159, 110 S.Ct. 1717 (1990) (collecting cases on potential future injury).

### 3. There are limits to this Court's jurisdiction, even in election-related litigation.

Ultimately, if this Court finds Plaintiffs have standing based on the current record, the doctrine of standing becomes nearly meaningless in the election context. Plaintiffs who have any interest in elections will be able to bring a lawsuit challenging any part of Georgia's Election Code, regardless of whether anyone has actually been harmed or may be harmed but based solely on the need to educate

---

[4] Even further speculation is required because Plaintiffs would also have to demonstrate that the rejection of a voter's ballot was not due to the voter's actions. When a voter failed to provide an address on his application for an absentee ballot, the Eleventh Circuit determined he lacked standing to assert a violation of his rights because the injury was not traceable to the actions of the defendants. *Swann v. Secretary*, 668 F.3d 1285, 1288 (11th Cir. 2012).

voters about an *existing* statutory framework. Plaintiffs must be required at the very least to present evidence about what they are currently doing with their resources, how those resources will have to be diverted if injunctive relief is denied, and how an injunction proposing an entirely new scheme for handling absentee ballots will remedy their alleged harm.

> *B. While Plaintiffs apparently do not seek relief against Gwinnett County in their Motion, Gwinnett County is not an appropriate class representative as alleged in Plaintiff's Complaint.*

Plaintiffs' proposed order on their preliminary injunction seeks only to require action by the Secretary of State, not by the Gwinnett BORE. [Doc. 5-6]. While Plaintiffs do not seek any relief against the Gwinnett BORE in this Motion, they propose in their complaint that the Gwinnett BORE could function as a class representative if the Court wishes to enjoin actions by all county election superintendents.[5] [Doc. 1, ¶¶ 41-45].

Plaintiffs have not sought certification of a class in their Motion, and this Court should not certify a class for purposes of entering a preliminary injunction. Certification can only be granted by motion, and Plaintiffs have sought no such relief at this point in the proceeding. *See* Fed. R. Civ. P. 7(b)(1); *see United*

---

[5] Indeed, if Plaintiffs seek to enjoin all county election officials regarding the implementation of the challenged statutes, they have failed to join parties necessary for the relief they seek. Fed. R. Civ. P. 19(a)(1)(A), *Laker Airways, Inc. v. British Airways, PLC*, 182 F.3d 843, 847 (11th Cir. 1999).

*Steelworkers of Am., AFL-CIO-CLC v. Connors Steel Co.*, 855 F.2d 1499, 1500

(11th Cir. 1988) (describing hearing on both a motion for class certification and a

motion for preliminary injunction); *Dodson v. Parham*, 427 F.Supp. 97, 100 (N.D.

Ga. 1977) (granting class certification and preliminary injunction only after motion

for certification and two-day evidentiary hearing).

The issue of the purported class of defendants proposed by Plaintiffs will

require extensive briefing, in significant part because the Gwinnett BORE is not an

appropriate class representative for a potential class action.[6] Unlike other defendant

classes, there is no joint effort of election officials from 159 counties beyond the

statutory framework. *Compare Research Corp. v. Pfister Associated Growers, Inc.*,

301 F. Supp. 497, 502 (N.D. Ill. 1969) (allowing defendant class when conspiracy

among class members had been proved). The Gwinnett BORE further has no

incentive or ability to protect the interests of every election official in the state of

Georgia related to Plaintiffs' claims (especially because it has no way of knowing

those interests), making it an inappropriate class representative. Fed. R. Civ. P.

---

[6] Having a proper class representative is only one of the elements required to certify a class. Federal Rule of Civil Procedure 23(a) sets forth the prerequisites for a class action and provides that a class of defendants may be certified only if (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the defenses of the class representatives are typical of the defenses of the class; and (4) the class representatives will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a).

23(a)(4), *Canadian St. Regis Band of Mohawk Indians by Francis v. State of N.Y.*, 97 F.R.D. 453, 457 (N.D. N.Y. 1983) (dismissing several defendants as representatives of defendant class when they had varying interests, willingness, and ability to defend the suit).

The Gwinnett BORE has no knowledge about how other counties are handling signature matching, although it assumes that other counties follow existing law. The Gwinnett BORE has no knowledge of whether other counties have different processes, or handwriting experts, or handle the notification process differently. Ledford Dec. at ¶ 17.

Plaintiffs apparently named the Gwinnett BORE based on its rejection rate for absentee ballots. Because Gwinnett County is one of the few counties that enters all of its applications and ballots into the Secretary of State's ENET system, Ledford Dec. at ¶ 16, it appears likely that Gwinnett is being penalized for its transparency in handling absentee ballots. Plaintiffs have no way of effectively comparing Gwinnett's rejection rate to any other county that does not use ENET for all of its applications and ballots.

While Plaintiffs apparently believe that the taxpayers of Gwinnett County should be saddled with the costs of statewide litigation and Plaintiffs' potential attorneys' fees, [Doc. 1, ¶ 43, p.23], Plaintiffs can easily identify and join all of the

required superintendents—which they especially should do if they are pursuing an as-applied challenge. This approach would also ensure that all taxpayers bear the burden equally for the costs of litigation brought by Plaintiffs instead of saddling the one county chosen by Plaintiffs with the entirety of that burden.[7]

## II. INJUNCTION ISSUES

Even if this Court determines that Plaintiffs have standing and that it will consider the merits of Plaintiffs' motion for an injunction, Plaintiffs have not shown they are entitled to an injunction. Plaintiffs have not shown there is no constitutional way to implement the challenged statutes nor have they shown that the proposed injunction is in the public interest, given the significant changes proposed at this late stage of the absentee balloting process.

> A. While the Gwinnett BORE does not take a position on the constitutionality of the challenged statutes, Plaintiffs have not shown the statute is unconstitutional in all its applications.

Plaintiffs only argue they are likely to succeed on the merits of their *facial* challenge to both statutes. [Doc. 5-1, p. 10-11]. A plaintiff can only succeed in a

---

[7] Class status is also inappropriate because "questions of law or fact common to class members" do not predominate. Fed. R. Civ. P. 23(b)(3). As discussed below, Plaintiffs have not shown that their facial challenge is likely to succeed, and if this is not a facial challenge, there are no common questions to be resolved and there are no common questions that could predominate, because Plaintiffs will have to present evidence of individual county practices. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359, 131 S.Ct. 2541 (2011); *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1268 (11th Cir. 2009).

facial attack on a statute by demonstrating that there is no way to constitutionally implement the statute. *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449, 128 S. Ct. 1184, 1190 (2008); *J.R. v. Hansen*, 736 F.3d 959, 965 (11th Cir. 2013). Facial challenges are disfavored for this reason, because they risk interpreting a statute without all the facts. *Sabri v. United States*, 541 U.S. 600, 609, 124 S.Ct. 1941 (2004). That risk is especially high here, because Plaintiffs' asserted emergency is a perceived threat, based solely on a number of rejected ballots instead of any actual knowledge of how the statute is being implemented in Gwinnett County. *See* [Doc. 5-1, pp. 1-2].

Plaintiffs have not shown that there is no constitutional way to implement the statutes in question. In fact, Plaintiffs have apparently suggested ways that, in their view, the statutes could be constitutionally implemented. Plaintiffs contend that counties should provide pre-rejection notices or that counties should provide training in handwriting analysis given the discretion granted to local officials, [Doc. 5-1, pp. 4-5], a tacit acknowledgement that there may be a way to constitutionally implement the statute, which defeats their facial challenge. Even the case upon which Plaintiffs heavily rely, *Hansen*, concluded that there may have been a way the challenged statute could have been constitutionally implemented,

which is why the Eleventh Circuit certified questions on state law to the Florida Supreme Court. 736 F.3d at 973-974.

*B. The Gwinnett BORE does not take a position on the harm Plaintiffs allege.*

The Gwinnett BORE recognizes the importance of voting and does not take a position on whether Plaintiffs have shown the second factor weighs in their favor, beyond noting that Plaintiffs have yet to identify a single individual whose fundamental right to vote has been restricted.

*C. The balance of equities does not favor Plaintiffs because of the significant impact Plaintiffs' proposal would make on both the operations of the Gwinnett BORE and Georgia voters.*

If this Court grants Plaintiffs' proposed relief, it is faced with one of two possibilities, both of which not only tip the equities against Plaintiffs' proposed injunction but weigh heavily against it. Either (1) the Gwinnett BORE (and possibly every other elections superintendent) would be required to begin using a different process for voters whose applications and ballots arrive in the last 10 days of the absentee voting period, or (2) the Gwinnett BORE (and possibly every other elections superintendent) would be required to divert staff time away from other election-related activities to begin another review of every rejected absentee ballot application and absentee ballot.

Election systems in the United States must avoid "arbitrary and disparate treatment to voters." *Bush v. Gore*, 531 U.S. 98, 107, 121 S. Ct. 525, 531 (2000). While Plaintiffs complain that such treatment occurs in Georgia due to alleged challenges with signature matching, they have presented no such evidence to this Court. And their proposed remedy will ensure that absentee voters *are* treated differently—with one standard for the first 35 days of early voting and another standard for the last ten.

If Plaintiffs propose to avoid this problem by a second review of all absentee ballot applications and ballots, they will sap valuable resources from already-overtaxed election workers and invite the real possibility of significant voter confusion. Ledford Dec. at ¶¶ 20-22. There is simply not time to re-train election officials to implement the remedies proposed by Plaintiffs.

And all of these alleged "problems" with Georgia's signature matching statutes could have been avoided if Plaintiffs had brought their lawsuit in a timely way instead of waiting until the last possible moment to attempt to change the rules. The equities do not favor making significant changes in the rules governing the election process at this point.

*D. The proposed injunction does not serve the public interest.*

Despite the critical importance of serving the public interest, particularly in the election context, Plaintiffs devote exactly two sentences to this prong in their brief. [Doc. 5-1, p. 24]. Plaintiffs' proposed injunction is not in the public interest because of their lack of diligence and the fact that the proposed order does not address the state's underlying interest in preventing voter fraud.

### 1. The proposed injunction is not in the public interest because Plaintiffs failed to exercise due diligence in bringing this action and seek to change the rules of the election after it is well underway.

Litigation involving elections is unique because of the interest in the orderly administration and integrity of the election process. *Purcell*, 549 U.S. at 4. The risks of voter confusion and conflicting orders counsel against changing election rules, especially when there is no time to resolve factual disputes. *Id*. at 5-6. In order to show they are entitled to a preliminary injunction, Plaintiffs must show they exercised reasonable diligence—something these Plaintiffs simply cannot do. *Benisek*, 138 S.Ct. at 1944.

In this case, Plaintiffs had more than enough time to bring these issues before the Court on a non-emergency basis. The processes outlined in O.C.G.A. §§ 21-2-381(b)(1)-(3) and 21-2-386(a)(1)(B)-(C) that Plaintiffs claim are

unconstitutional have been in place since at least 2003, if not significantly earlier. *See* 2003 GA. LAWS Act 209 and 2005 GA. LAWS Act 53.

Further, Plaintiffs' counsel had personal knowledge of potential constitutional claims related to signature matching earlier this year. Plaintiffs rely heavily on *Saucedo v. Gardner*, ___ F.Supp.3d ___, 2018 WL 3862704 at *2 (D. N.H. August 14, 2018), which was filed in May 2017. Plaintiffs' counsel Dale Ho is listed as counsel of record in that case. *Id*. The exhibits attached to Plaintiffs' Brief are cases from March 2018 [Doc. 5-5] and July 2018 [Doc. 5-4].

Despite challenging statutes that have been on the books and used for more than 15 years and knowledge of cases on similar issues brought months before, Plaintiffs waited until October 16, 2018—just 21 days before the general election and 28 days after absentee ballots began to be distributed to voters—to bring this lawsuit. [Doc. 1]. Plaintiffs waited until the election machinery was well underway before even attempting to bring these issues before the Court, which hardly shows they exercised reasonable diligence in this case. *Reynolds*, 377 U.S. at 585; *Benisek*, 138 S.Ct. at 1944.

It is simply too late to change the rules of an election when it is already underway. Staff resources that will have to be taken away from other election-related activity and the potential for voter confusion is too great. This Court should

deny a preliminary injunction to ensure that there is an orderly election, following the same rules for all absentee ballots. *Benisek*, 138 S.Ct. at 1944-45.

> ### 2. The proposed order is not in the public interest because it does not address the underlying danger of fraud in absentee ballots.

As outlined above, absentee ballots are a source of potential fraud. Given the lack of other identification requirements for absentee voters, the signature match and year of birth on the outer envelope containing the absentee ballot are the only ways to verify the identity of the voter, and Plaintiffs agree that this is the purpose of the signature match process. [Doc. 5-1, pp. 20-21].

But Plaintiffs' proposed order undermines the state's interest in avoiding fraud in absentee balloting, by allowing confirmation of identity by emailing or faxing photo identification to the registrar. [Doc. 5-6, p. 2]. A faxed or emailed copy of photo identification does nothing to verify whether the voter in fact signed the oath on the absentee ballot. It merely shows that whoever signed it had access to the voter's photo identification. In the 2012 case in which Director Ledford was involved, the dead voter's son likely had access to his father's photo identification and could have followed the process outlined by the Plaintiffs' proposed order, ultimately allowing a fraudulent ballot to be cast.

Any remedy proposed by Plaintiffs must address the state's interest in preventing absentee ballot fraud. *Common Cause/Georgia*, 554 F.3d at 1353-55.

Plaintiffs' proposed order is also not in the public interest because it does not address this critical state interest.

## CONCLUSION

Plaintiffs have not presented sufficient evidence that they have standing to seek this temporary restraining order. But even if they have, this Court should deny their motion because they have not shown they are likely to succeed on their facial challenge, they have not shown the equities favor granting an injunction, and entering an injunction at this point in the election process will not serve the public interest.

### Certification

I certify that this brief has been prepared in a Times New Roman 14-point font, one of the font and point selections approved by the Court in Local Rule 5.1(C). This Court authorized a brief of up to 35 pages on October 22, 2018 [Doc. 21].

Respectfully submitted this 22nd day of October, 2018.

/s/ Bryan P. Tyson
Frank B. Strickland
Georgia Bar No. 687600
fbs@sbllaw.net
Anne W. Lewis
Georgia Bar No. 737490
awl@sbllaw.net

Bryan P. Tyson
Georgia Bar No. 515411
bpt@sbllaw.net
STRICKLAND BROCKINGTON
  LEWIS LLP
Midtown Proscenium Suite 2200
1170 Peachtree Street NE
Atlanta, GA 30309
(678)347-2200

RICHARD A. CAROTHERS
Georgia Bar No. 111075
richard.carothers@carmitch.com
Brian R. Dempsey
Georgia Bar No. 217596
Brian.dempsey@carmitch.com
CAROTHERS & MITCHELL, LLC
1809 Buford Highway
Buford, GA 30518
(770) 932-3552

*Attorneys for the Gwinnett County Board of*
*Registrations and Elections*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| GEORGIA MUSLIM VOTER PROJECT and ASIAN-AMERICANS ADVANCING JUSTICE-ATLANTA,<br><br>    Plaintiffs,<br><br>vs.<br><br>BRIAN KEMP, in his official capacity as the Secretary of State of Georgia; and GWINNETT COUNTY BOARD OF VOTER REGISTRATION AND ELECTIONS, on behalf of itself and similarly situated boards of registrars in all 159 counties in Georgia,<br><br>    Defendants. | Civil Action No.: 1:18-cv-04789-LMM |

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I have this date electronically filed the foregoing **DEFENDANT GWINNETT COUNTY BOARD OF REGISTRATION AND ELECTIONS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER** with the Clerk of the Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

Richard Carothers
Cristina Correia
Brian Dempsey
Dale E. Ho
Sophia Lin Lakin
Anne W. Lewis
Frank Strickland
Sean Young

This 22nd day of October, 2018.

/s/ Bryan P. Tyson
Bryan P. Tyson
Georgia Bar No. 515411