IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| GEORGIA MUSLIM VOTER PROJECT and ASIAN-AMERICANS ADVANCING JUSTICE-ATLANTA, <br><br> Plaintiff, <br><br> vs. <br><br> BRIAN KEMP, in his official capacity as the Secretary of State of Georgia; and GWINNETT COUNTY BOARD OF VOTER REGISTRATION AND ELECTIONS, on behalf of itself and similarly situated boards of registrars in all 159 counties in Georgia, <br><br> Defendants. | Civil Action No.: 1:18-cv-04789-LMM |

# PLAINTIFFS' REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER

## INTRODUCTION

Every day, absentee voters are having their ballots rejected due to an unconstitutional law that fails to give them pre-rejection notice or an opportunity to have their validly-cast ballots counted. Despite doing everything that the law requires of them, these voters will nonetheless be permanently disenfranchised if they receive their rejection notice too late (*i.e.*, on or after Election Day)—even if they are able to vote in-person. Whether this fate befalls them depends entirely— and arbitrarily—on how fast the U.S. Postal Service processes mail, when elections officials get around to processing absentee ballots, and when they get around to sending rejection notices under the vast discretion that is provided to them under Georgia law.

But the time is quickly approaching in which *all* absentee voters with an alleged signature mismatch *will* be permanently disenfranchised. Based on the procedures articulated in Gwinnett County's brief, voters will not receive notice of their rejection for at best five to nine days after they mail their absentee ballots: one to three days for the mailed absentee ballot to be received by elections

1

officials;[1] an indeterminate amount of time for an elaborate signature matching procedure involving five different officials, Gwinnett Br. at 6-7; three days to mail the rejection notice, *id.* at 6; and another one to three days for the voter to receive the rejection notice by mail. And that assumes each step in this processis executed flawlessly, and that absentee ballots are instantly processed. Election Day is only 14 days away.

As the Secretary of State is ultimately forced to concede, "a voter whose absentee ballot is received by the county on the day of the election, or even a day before the election, is not likely to receive notice of their rejected ballot until after the election." Sec'y Br. at 29. This indeterminate pool of voters—which grows with each passing day—will be permanently disenfranchised unless the Court grants immediate relief.

---

[1] *See* Amelia Jenkins, *How Long Does Priority Mail and First Class Mail Take?*, at https://smallbusiness.chron.com/long-priority-mail-first-class-mail-take-12165.html ("The United States Postal Services reports that as of January 2018, it takes an average of one to three days for First-Class Mail to arrive at its destination."); *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995) ("[a]t the preliminary injunction stage, a district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is 'appropriate given the character and objectives of the injunctive proceeding.'" (citation omitted)).

Though the stakes are high, Plaintiffs' proposed remedy is simple. It does nothing more than apply an existing back-end safety net, O.C.G.A. § 21-2-230(g), that ensures that absentee voters who have done everything right have an opportunity to explain or resolve their signature-mismatch. As they do with other absentee ballot challenges, elections officials will have the breathing room to conduct these informal proceedings after Election Day.

## ARGUMENT

Defendants Brian Kemp ("the Secretary") and Gwinnett County Board of Voter Registration & Elections ("Gwinnett County") have filed a combined 70-pages of briefing which can be distilled into four basic arguments: 1) Plaintiffs allegedly lack standing; 2) Plaintiffs have not identified an individual who has been permanently disenfranchised thus far; 3) Plaintiffs allegedly "waited" too long to file this suit; 4) the statute provides adequate due process.

As discussed below, these arguments are meritless. 1) Plaintiffs have organizational standing under the straightforward rule articulated in *Common Cause/Georgia v. Billups*, 554 F.3d 1340 (11th Cir. 2009), which does not articulate the extra standing requirements that Defendants wish to impose; 2) Plaintiffs have established the likelihood of irreparable harm due to the increasing number of absentee voters who will not receive a rejection notice until it

is too late; 3) Defendants do not dispute that Plaintiffs, without delay, sprang into action directly in response to the October 12 news article which reported on the magnitude of the problem; and 4) the statute deprives the right of absentee voters to have their validly-cast ballots counted without adequate due process.

I.  **PLAINTIFFS HAVE ORGANIZATIONAL STANDING**

The Eleventh Circuit has articulated the straightforward standard for organizational standing in a voting rights case. In *Common Cause/Georgia v. Billups*, 554 F.3d 1340 (11th Cir. 2009), the Eleventh Circuit held that "'an organization has standing to sue on its own behalf if the defendant's illegal acts impair its ability to engage in its projects by forcing the organization to divert resources to counteract those illegal acts.'" *Id.* at 1350 (citation omitted). Standing is established if the organizations "'reasonably anticipate[d] that they [would] have to divert personnel and time to educating volunteers and voters on compliance' with the new voting requirements." *Id.* (citation omitted).

There, the NAACP was held to have standing because its testimony established that: 1) it "is involved in voter registration, mobilization, and education" and it "uses [its] resources to maximize the ability to mobilize voters and educate voters and register voters"; and 2) the challenged statute would require the NAACP to "divert volunteers and resources from 'getting [voters] to the polls'

4

to" responding to the challenged law, and that the NAACP would have to "redistribute [its] resources." *Common Cause*, 554 F.3d at 1350.

Similarly here, Plaintiffs the Georgia Muslim Voter Project and Asian-Americans Advancing Justice-Atlanta have standing because their declarations establish that: 1) they are involved in "registering voters and increas[ing] voter engagement and turnout," Ex. A (Ali Decl.) ¶ 2, or "increasing civic engagement and voter turnout" and "assisting with registering voters," Ex. B (Cho Decl.) ¶ 2; and 2) both organizations "must now divert" resources away from these critical organizational activities and "towards warning voters about [the] risk [of disenfranchisement], especially voters who vote absentee closer to Election Day" and "towards following up with voters" in ways detailed in the declarations. Ex. A (Ali Decl.) ¶¶ 3-4; Ex. B (Cho Decl.) ¶¶ 4-5. Thus, both Plaintiffs have organizational standing.

To distract from this straightforward analysis, the Secretary first proffers a red herring, arguing that Plaintiffs cannot establish standing on the basis of "costs associated with litigation." Sec'y Br. at 6. But Plaintiffs do not argue that they have standing due to resources expended towards litigation. The Secretary later speculates that the resources expended "may well have been in anticipation of such litigation." *Id.* at 10. Nothing in the record suggests this to be true. To the contrary,

Plaintiffs are doing everything they can to ensure that rejected absentee voters can somehow cure their rejection—an opportunity that narrows with each passing day. Unless this Court enters a TRO, these efforts will continue.

The bulk of the Secretary's remaining argument is that Plaintiffs lack standing because their declarations do not sufficiently detail with some mathematical precision "what day-to-day operations" were impacted by the diversion of resources, and by how much. Sec'y Br. at 7-13. Yet the Eleventh Circuit did not require such precision in *Common Cause*, which explained some of Plaintiffs' daily operations with specifying exactly how much those daily operations were hampered. And it did not require such precision in *Arcia v. Florida Secretary of State*, 772 F.3d 1335, 1341-42 (11th Cir. 2014), which found organizational standing in a voting rights case based solely on "affidavits showing they have missions that include voter registration and education . . . , and that they had diverted resources to address the Secretary's programs," and followed up with potentially disenfranchised voters.

Gwinnett County takes a different tack, asserting that the activities to which Plaintiffs have been forced to divert their resources in response to the challenged law (*e.g.*, warning voters about the signature matching requirement, making phone calls to registrars, and targeting in-person voting help to rejected absentee voters)

6

fall under the same general umbrella of voter engagement activities in which they already engage. Gwinnett Br. at 14-15. This suggests that Plaintiffs can only have standing if they divert existing voter engagement resources towards activities that are completely unrelated to voter engagement. Gwinnett County cites no caselaw establishing this rule because it does not exist. To the contrary, the Eleventh Circuit has found organizational standing when a voter engagement organization diverted resources from existing voter engagement activities to other voter engagement activities. *See Arcia*, 772 F.3d at 1341-42 (finding standing where voter engagement organization diverted resources towards "locat[ing] and assist[ing] the members to ensure that they were able to vote"); *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1165-66 (11th Cir. 2008) (finding standing where voter engagement organizations will divert resources to "educating volunteers and voters" and "to resolving the problem of voters left off the registration rolls").

Both Defendants argue that Plaintiffs lack standing because it is based on "future harm that is speculative and uncertain." Sec'y Br. at 10; *see also* Gwinnett Br. at 15-16. But even if Plaintiffs had not already suffered injury by its present and ongoing resource diversion, under *Browning*, 522 F.3d at 1166, the resource diversion need only be "reasonably anticipate[d]." Around 600 absentee ballots or

7

applications have already been rejected due to a signature mismatch. Ex. A (Ali Decl.) ¶ 7. It is reasonable for Plaintiffs to anticipate that they must help these voters, especially as more and more voters cast absentee ballots leading up to the Friday before Election Day.

Lastly, both Defendants argue that the injury is not redressable. Sec'y Br. at 13-15; Gwinnett Br. at 16. This is plainly false. The declarations clearly establish that if this Court grants Plaintiffs' request for relief, Plaintiffs can re-divert their resources back to their preexisting operations.

For these reasons, Plaintiffs have standing.[2]

## II. VOTERS WILL SUFFER IRREPARABLE HARM WITHOUT AN INJUNCTION

Both Defendants assert that Plaintiffs have not identified a single voter

---

[2] Should this Court believe that Plaintiffs do not have standing based on the existing declarations, attached as Exhibits E and F are supplemental declarations providing more detail about the activities from which Plaintiffs have diverted their resources, and the activities which Plaintiffs must now do as a result of the challenged law. In addition, Plaintiffs have attached a declaration from an individual, Lana Goitia, whose absentee ballot was rejected due to a signature mismatch and who will be forced to find a way to cure the rejection. *See* Exhibit G. Such individuals have standing even when "they [are] ultimately not prevented from voting," *Arcia*, 772 F.3d at 1341, especially where, as here, she wishes to have absentee balloting be a realistic option for her in the future. Plaintiffs may amend their complaint as of right to include her as a plaintiff if necessary.

whose absentee ballot has been rejected and who will be unable to cure the rejection. *See* Sec'y Br. at 1, 18, 34; Gwinnett Br. at 23. But Plaintiffs have amply demonstrated a likelihood of irreparable harm. It is futile for voters whose absentee ballots have been rejected to apply for a second absentee ballot, since, even if sufficient time remains to do so, there is no reason the same signature will not be rejected again. Thus, voters who voted absentee because they cannot vote in-person (*i.e.*, due to lack of transportation, age, disability, or simply being out of town) are permanently disenfranchised.

As for other voters who theoretically might be able to cure their rejection by voting in-person, that window of opportunity is rapidly closing. As discussed in the introduction, it may take up to *nine days or more* for someone submitting an absentee ballot to receive notice of their rejection in the mail—and that is assuming optimistically (and unrealistically) that all absentee ballots are *instantly* processed. None of the statutes establish a timetable as to how fast ballots must be processed or how fast rejections must be sent.

There are only 14 days left until Election Day. The likelihood that an absentee voter will not receive a rejection notice until it is too late (*i.e.*, on or after Election Day) is rapidly increasing by the day. For absentee voters casting ballots in the coming days, it will soon be a virtual certainty that they will receive their

rejection notices too late, and be permanently disenfranchised. Rather than waiting for that to happen, Plaintiffs have moved expeditiously before this Court to ensure these voters have an opportunity to have their validly-cast ballots counted. A TRO is urgently needed.

## III. PLAINTIFFS SPRANG INTO ACTION IN RESPONSE TO THE OCTOBER 12 NEWS ARTICLE

Both Defendants suggest that Plaintiffs, which they sometimes confuse with their counsel, the ACLU, "waited" too long to file this suit. *See* Sec'y Br. at 15-18; Gwinnett Br. at 25, 26. To the contrary, both the Georgia Muslim Voter Project and Asian-Americans Advancing Justice-Atlanta have acted diligently. As the declarations attest, both organizations acted in response to an October 12 article highlighting the apparent magnitude of the problem in Gwinnett County, where both organizations concentrate their efforts. Ex. A (Ali Decl.) ¶ 3; Ex. B (Cho Decl.) ¶ 4. This lawsuit was filed on October 16. The TRO motion was filed on October 17.

Contrary to Defendants' belief, voter engagement organizations do not spend all their time scouring the Election Code for every possible problem that exists, then expend their limited resources tackling every single hypothetical problem that might arise. Instead, they divert their limited resources towards

addressing a problem only when they are made aware of its magnitude, and that often happens only when the news media discovers it.

Laches is ultimately a determination based on equitable considerations, and given Plaintiffs' diligence in immediately bringing this suit and seeking relief afterlearning of the magnitude of the issue presented here, this suit should not be barred. *See, e.g.*, *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers*, 781 F.3d 1271, 128384 (11th Cir. 2015) ("reasonable" for plaintiff to "wait" until it became "[]clear 'when or how' [Plaintiff] would be injured"). Moreover, courts routinely enter injunctive relief close to an election, especially when the relief deals solely with back-end procedures implemented after ballots or registration forms have already been submitted, including procedures implemented after Election Day. Those are the same kinds of back-end procedures sought after here. In all these cases, the equitable balance was struck in favor of the voter notwithstanding the timing of the injunction.[3]

---

[3] *See, e.g.*, *Fla. Democratic Party v. Detzner*, 4:16cv607-MW/CAS, 2016 WL 6090943 (N.D. Fla. Oct. 16, 2016) (entering injunction 22 days before 2016 general election to permit voters opportunity to cure signature mismatch on absentee ballots); *Brown v. Kobach*, Order Granting Temporary Injunction, 2016-CV000550 (Kansas Third Judicial Dist. July 29, 2016) (attached as Exhibit H)

11

## IV. PLAINTIFFS HAVE ESTABLISHED A DUE PROCESS VIOLATION

Absentee voters who do everything right deserve to have their ballot counted, especially those now casting absentee ballots who face an increasing risk of permanent disenfranchisement.[4] As set forth in Plaintiffs' moving brief, Plaintiffs are likely to succeed in the merits of their claims.

The Secretary argues that because Plaintiffs "have no federal constitutional right to an absentee ballot, procedural due process protections apply *only to the extent* that the State has conferred such rights to Plaintiffs," Sec'y Br. at 24, and that because Georgia allows absentee ballots to be rejected when elections officials determine that signatures do not match, that is the extent of the right, *id.* This

---

(entering injunction 4 days before primary requiring counting of validly cast votes for state offices); *Ohio APRI v. Husted*, 2:16-cv-303, 2016 WL 6093371 (S.D. Ohio Oct. 19, 2016) (entering injunction 20 days before election requiring counting of validly cast provision ballots by certain voters); *U.S. Stud. Ass'n Found. v. Land*, 585 F. Supp. 2d 925 (E.D. Mich. Oct. 13, 2008) (entering injunction 22 days before election requiring acceptance of certain submitted voter registration forms); *Bay Cnty. Democratic Party v. Land*, 347 F. Supp. 2d 404 (E.D. Mich. 2004) (entering injunction 16 days before election requiring counting of out-of-precinct ballots); *Action NC v. Strach*, 216 F. Supp. 3d 597 (M.D.N.C. 2016) (entering injunction 5 days before election requiring counting of certain validly cast provisional ballots).

[4] Contrary to Defendants' claims, Plaintiffs' requested remedy does not undermine any asserted interests in preventing voter fraud. All that Plaintiffs are requesting is an opportunity for voters to resolve any concerns about their identity.

tautological proposition defines the Due Process Clause out of existence. If the right protected by the Due Process Clause is limited by whatever procedures are in the statute, then no statute would ever violate the Due Process Clause. The Secretary's proposition also completely ignores *United States v. Atkins*, 323 F.2d 733, 743 (5th Cir. 1963), which held that the right to *register* to vote was a protected interest requiring notice and an opportunity to be heard, even though there is no "federal constitutional right" for anyone to register to vote.

The argument also misunderstands the nature of the protected interest here. An absentee voter who does everything right—who fills out the ballot and ballot envelope and signs the oath—has a right to have their absentee ballot counted. The fate of their vote should not be dependent upon the subjective determinations of laypersons without due process of law. *Cf. Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 243 (6th Cir. 2011) ("we have substantial constitutional concerns regarding the invalidation of votes cast in the wrong precinct due solely to poll-worker error"). Indeed, Defendants notably do not dispute that the same person can have two different signatures for a variety of innocent reasons, nor do they dispute that elections officials are not handwriting experts. It is thus unsurprising that so many courts have found a violation of due process when validly cast absentee ballots are rejected on the basis of a layperson's signature

13

comparison without an opportunity to be heard. *See* Pls.' Br. at 21-22.

The Secretary seeks to distinguish this case from these other decisions, emphasizing that notice was not provided in some of those challenged statutes, unlike Georgia's law. Sec'y Br. at 25-29. But while Georgia's law does provide post-rejection notice, it does not provide any *opportunity* for the voter to resolve the alleged signature discrepancy, which renders the notice useless for voters who receive their rejection notice too late.

The Secretary also argues that Plaintiffs' facial challenge must fail because there is at least one set of circumstances under which the statute would be valid— when people vote absentee "weeks before the election" and are "immediately notified of the rejection in advance of Election Day." Sec'y Br. at 19. But they do not dispute that the statutes establish no clear timetable for when absentee ballot applications must be processed, when absentee ballots must be processed, and when rejections must be sent. Even voters who cast their absentee ballots "weeks before the election" may still receive their rejection notice too late. Though the Secretary suggests that voters *may be* "immediately notified" of the rejection, hypothetical procedural protections not mandated by statute play no role in the facial due process analysis. For example, when addressing a facial procedural due process challenge in *J.R. v. Hansen*, 803 F.3d 1315, 1325 (11th Cir. 2015)

14

("*Hansen II*"), the Eleventh Circuit found a due process violation notwithstanding the government's argument that the government "*may use*" additional procedural protections, because, as the Court explained, the Due Process Clause "*require[s]*, not merely *permit[s]*," such procedures. *See also J.R. v. Hansen*, 736 F.3d 959, 966 (11th Cir. 2013) ("In facial due process challenges, [courts] look[] to the statute as written to determine whether the procedure provided comports with due process. [Courts do not] simply rely on the defendant's description of how the statute operates in practice.").

Ultimately, the Secretary is forced to concede that "a voter whose absentee ballot is received by the county on the day of the election, or even a day before the election, is not likely to receive notice of their rejected ballot until after the election." Sec'y Br. at 29. Given the unpredictable lag time of both mail and ballot processing, the risk of this occurring increases with each passing day. At a minimum, the emergency relief requested here is necessary to protect those voters who will otherwise be permanently disenfranchised, without any due process protections at all.

## CONCLUSION

The risk of permanent disenfranchisement of absentee voters increases with each passing day. Plaintiffs' urgent request for a TRO should be granted.

Respectfully submitted,

this 22nd of October, 2018	s/ Sean J. Young_____

Sean J. Young (Ga. Bar No. 790399)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF GEORGIA, INC.
P.O. Box 77208
Atlanta, GA 30357
770-303-8111 (phone)
770-303-0060 (fax)
syoung@acluga.org

Sophia Lin Lakin\*
Dale E. Ho
AMERICAN CIVIL LIBERTIES UNION
125 Broad Street, 18th Floor
New York, NY 10004
212-519-7836 (phone)
slakin@aclu.org
dho@aclu.org

Attorneys for Plaintiffs

*Pro hac vice application submitted*

# CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief has been prepared in accordance with the font type and margin requirements of LR 5.1, using font type of Times New Roman and a point size of 14.

s/ Sean J. Young_____

Sean J. Young (Ga. Bar No. 790399)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF GEORGIA, INC.
P.O. Box 77208
Atlanta, GA 30357
770-303-8111 (phone)
770-303-0060 (fax)
syoung@acluga.org

# CERTIFICATE OF SERVICE

I hereby certify that on October 22, 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system. Counsel for Defendants have entered notices of appearance in this case, and will thus receive electronic notice of the filing.

Date: October 22, 2018

s/ Sean J. Young_____

Sean J. Young (Ga. Bar No. 790399)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF GEORGIA, INC.
P.O. Box 77208
Atlanta, GA 30357
770-303-8111 (phone)
770-303-0060 (fax)
syoung@acluga.org