IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| GEORGIA MUSLIM VOTER PROJECT, et al., | * | |
| | * | |
| | * | |
| Plaintiffs, | * | CA No. 1:18cv4789-LMM |
| | * | |
| vs. | * | |
| | * | |
| BRIAN KEMP, in his official capacity as Secretary of State of Georgia, et al., | * | |
| | * | |
| | * | |
| Defendants. | * | |
| _____ | * | |
| RHONDA J. MARTIN, et al., | * | |
| | * | |
| Plaintiffs, | * | CA No. 1:18cv4776-LMM |
| | * | |
| vs. | * | |
| | * | |
| BRIAN KEMP, in his official capacity as Secretary of State of Georgia, et al., | * | |
| | * | |
| | * | |
| Defendants. | * | |
| _____ | * | |

**DEFENDANT BRIAN KEMP'S *EMERGENCY*[1] MOTION FOR STAY PENDING APPEAL OF PRELIMINARY INJUNCTION**

_____

[1] There exists good cause for treating this as an emergency motion and waiving the time requirements of Local Rule 7.1. This Court's injunction requires substantial changes and additions to election processes in the middle of an ongoing election, and it will continue to cause irreparable harm as long as it remains in place.  Secretary Kemp thus asks this Court to rule on the motion as soon as possible.

1

Defendant Brian Kemp moves this Court for a stay pending appeal of its order granting a preliminary injunction in these cases.  Last-minute challenges to longstanding election procedures have long been disfavored because they threaten to disrupt the orderly administration of elections, which is essential to the functioning of our participatory democracy.  This Court's preliminary injunction is a case in point; by adding brand new, untested processes ad hoc to long established election procedures at the eleventh hour, it will introduce uncertainty and confusion under extreme time pressure at best, and it risks undermining the integrity of the State's election process.  Staying that injunction to allow review by the Eleventh Circuit will ensure at least a measure of careful deliberation before upending the State's election processes in the middle of a general election.[2]

_____

[2] The Order is appealable as an injunction, notwithstanding the fact that it is labeled a "Temporary Restraining Order" in the heading.  (Doc. 32 at 2). Courts examine the nature and function of an order in order to determine whether an order is appealable, and the trial court's label is not decisive. *Mamma Mia's Trattoria v. Original Brooklyn Water Bagel Co.*, 768 F.3d 1320, 1326, n.5 (11th Cir. 2014) ("Though the court did not specifically label its proscription as an injunction, the functional effect of the order controls."); *Mitsubishi Int'l Corp. v. Cardinal Textile Sales, Inc.,*, 14 F.3d 1507, 1515, n. 14 ("This court is not bound to accept a district court's characterization of its own rulings.") *See also Northeast Ohio Coalition for the Homeless v. Blackwell*, 467 F.3d 999, 1005 (6th Cir. 2006) (an order is appealable "if it has the practical effect of an injunction" and "the label attached to an order by the trial court is not decisive").  In ordering the Secretary to undertake affirmative action, this Order is in substance an injunction, and this Court identified it as an "injunction" in the body of the Order. (Doc. 32 at 3, ¶ 3).

## ARGUMENT

**Secretary Kemp is Entitled to a Stay Pending Appeal of This Court's Order Granting a Preliminary Injunction.**

"[A]s part of its traditional equipment for the administration of justice, a federal court can stay the enforcement of a judgment pending the outcome of an appeal." *Nken v. Holder*, 556 U.S. 418, 421 (2009).  Courts consider four factors to determine whether to grant a stay pending appeal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hand v. Scott*, 888 F.3d 1206, 1207 (11th Cir. 2018) (quoting *Nken*, 556 U.S. at 426).  "The first two factors are the 'most critical.'" *Id.*

Each of these factors favors granting a stay pending Secretary Kemp's appeal of this Court's order granting a preliminary injunction.

### A.   Secretary Kemp Is Substantially Likely to Succeed on the Merits of His Appeal.

#### 1.  Laches Bars Plaintiffs' Claims.

Many courts have concluded that laches barred a last-minute challenge to longstanding election laws during or on the eve of elections.  *See Perry v. Judd*, 471 Fed. Appx. 219 (4th Cir. 2012) (laches barred "last-minute lawsuit" challenging

Virginia election laws and seeking injunctive relief where the laws had been "on the books for years"); *Marshall v. Meadows*, 921 F. Supp. 1490, 1493-94 (E.D. Va. 1996) (laches barred challenge to Virginia open primary law when plaintiffs filed suit 95 days before the challenged primary was scheduled to take place, noting that "plaintiffs have slept on their rights"); *Fulani v. Hogsett*, 917 F.2d 1028, 1031 (7th Cir. 1990) (laches barred claim when plaintiff waited 11 weeks to file suit as election approached); *Marcellus v. Va. State Board of Elections*, 2015 U.S. Dist. LEXIS 120584 (E. D. Va. 2015) (finding laches when plaintiffs challenge statute that had been in effect for 14 years); *Soules v. Kauaians for Nukolii Campaign Committee*, 849 F. 2d 1176 (9th Cir. 1988) ("The record establishes without dispute that appellants knew the basis for their alleged equal protection challenge well in advance of the proposed special election … [and] district court did not error in barring . . . relief on the ground of laches."). So here.

Laches bars a request for equitable relief when (1) the plaintiff delays in asserting the claim; (2) the delay is not excusable; and (3) the delay causes the non-moving party undue prejudice. *United States v. Barfield*, 396 F.3d 1144, 1150 (11th Cir. 2005); *Kason Indus. v. Component Hardware Group*, 120 F.3d 1199, 1203 (11th Cir. 1997); *see also Costello v. United States*, 365 U.S. 265, 282 (1961). Each element is met here.

That Plaintiffs delayed in asserting their claims is plain.  Plaintiffs challenge statutory provisions that have been part of Georgia's election code for decades, and yet they waited until *after* the start of the 2018 general election, to bring their emergency suits.

This delay is not excusable.  A party requesting a preliminary injunction must generally show reasonable diligence, *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018), and that is as true in election law cases as elsewhere.  *Id.; Lucas* v. *Townsend*, 486 U. S. 1301, 1305 (1988) (Kennedy, J., in chambers); *Fishman* v. *Schaffer*, 429 U. S. 1325, 1330 (1976) (Marshall, J., in chambers).  On this point, *Perry* is instructive. There, the Fourth Circuit affirmed the denial based on laches of an emergency motion seeking injunctive relief in a constitutional challenge brought by former Texas Governor Rick Perry to two Virginia statutes setting forth requirements for circulation of petitions for ballot access: "Plaintiffs had every opportunity to challenge [the Virginia statutes] at a time when the challenge would not have created the disruption that this last-minute lawsuit has.  [Plaintiffs'] request contravenes repeated Supreme Court admonitions that federal judicial bodies not upend the orderly progression of state electoral processes at the eleventh hour.  [Plaintiffs] knew long before now the requirements of Virginia's election laws.  There was no failure of notice.  The requirements have been on the books for years."  *Perry*, 471 Fed.

Appx. at 220-21.  The Court went on to state that eleventh hour changes to an otherwise orderly election process are "not just caution lights to lower federal courts; they are sirens." *Id.* at 228.  That admonition applies equally here.

It is true that "[a]n inexcusable delay can only occur after the plaintiff discovers or should have discovered the facts giving rise to his or her cause of action." *Marcellus v. Va. State Bd. of Elections*, 2015 U.S. Dist. LEXIS 120584 at *17 (E.D. Va. 2015).  But as this Court acknowledged, Plaintiffs challenge the statute only on its face, so no "facts giving rise to [their] cause of action" awaited discovery. This Court pointed out that Plaintiffs contended that news articles "highlighted" the alleged issues with the law for them, *GMVP* Doc. 28 at 18, but the provisions at issue have been part of Georgia's election law for decades, and Plaintiffs have offered no valid excuse for not knowing they were on the books.  Indeed, the *GMVP* Plaintiffs contend that their "mission includes increasing civic engagement and voter turnout," *GMVP* Docs. 5-2 ¶ 2, 5-3 ¶ 2, which suggests that they should have been acutely aware of the election laws and particularly able to bring these claims well in advance of the election.

Finally, Plaintiffs' requested relief (and the Court's granted relief) would cause significant prejudice to the Defendants.  Harvey Decl. ¶ 15, *GMVP* Doc. 31-1 Ledford Decl. ¶¶ 19-22, *GMVP* Doc. 30-1.  "Ballots and elections do not magically

materialize.  They require planning, preparation, and studious attention to detail if the fairness and integrity of the electoral process is to be observed."  *Perry*, 471 Fed. Appx. at 226.  Last-minute challenges to election laws result not only in prejudice to governmental defendants who must administer and supervise the elections, but also to the public, since governmental defendants "are charged with ensuring the uniformity, fairness, accuracy, and integrity of [the state's] elections."  *Id.* at 227.  Serious disruption to state electoral processes is thus directly against the public interest in having an orderly and fair election.  *Id.* at 227.  The relief requested (and granted) here is no exception. *See generally* Harvey Supp. Decl., *GMVP* Doc. 31-1 Ledford Supp. Decl., *GMVP* Doc. 30-1.

### 2. Plaintiffs Are Not Likely to Prevail on the Merits of Their Facial Due Process Challenge.

"A § 1983 claim alleging a denial of procedural due process requires proof of three elements: (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process."  *J.R. v. Hansen*, 736 F.3d 959, 965 (11th Cir. 2013).  And where, as here, the claim is a facial challenge, a plaintiff must show that "no set of circumstances exists under which the [statute] would be valid, *i.e.*, that the law is unconstitutional in all of its applications." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).  Plaintiffs have

failed to state a facial procedural due process claim.[3]  Even assuming the State has

conferred a protected liberty or property interest in voting via absentee ballot, the

statutory process for doing so comports with federal due process—or at the very least,

cannot be said to violate due process in all its applications.

   In determining what process is due when the state deprives one of its citizens

of a liberty or property interest, courts apply the factors from *Mathews v. Eldridge*,

which balance (1) "the private interest that will be affected by the official action"; (2)

"the risk of an erroneous deprivation of such interest through the procedures used,

and the probable value, if any, of additional or substitute procedural safeguards; and

(3) "the Government's interest, including the function involved and the fiscal and

administrative burdens that the additional or substitute procedural requirement would

entail." *Hansen*, 736 F.3d at 966.  "The Supreme Court in *Mathews* admonished

courts employing this test to recognize that 'procedural due process rules are shaped

by the risk of error inherent in the truth finding process as applied to the generality of

cases, not the rare exceptions.'" *Id.* (quoting *Mathews*, 424 U.S. at 344).

---

[3] Secretary Kemp notes that the *Martin* plaintiffs have not raised, briefed, or argued a procedural due process claim at all; their complaint raises only a substantive due process claim and an equal protection claim. (*Martin* Doc. 10 ¶¶ 54–72.) There could hardly be a clearer example of a failure to state a claim on which relief may be granted.  For this reason alone,  Court erred in granting a preliminary injunction in the *Martin* case based on a likelihood of success on the merits of a procedural due process claim (*Martin* Doc. 23 at 21), and Secretary Kemp is therefore exceedingly likely to succeed on the merits of his appeal in *Martin*.

"And constitutionally adequate process, the Supreme Court has said, is a flexible concept that 'cannot be divorced from the nature of the ultimate decision that is being made.'" *Id.* at 965 (quoting *Parham v. J.R.*, 442 U.S. 584, 608 (1979)).

Applying the *Mathews* factors shows that Georgia's statutory scheme provides sufficient procedural safeguards for individuals who wish to take advantage of the convenience of voting by mail.

*First*, contrary to this Court's suggestion, the private interest at issue here is not "entitled to substantial weight" because it "implicates the individual's fundamental right to vote." (*GMVP* Doc. 28 at 24). Plaintiffs allege that the signature-match requirement leads to deprivations of two interests here: receiving an absentee ballot and being able to vote by absentee ballot. Those interests together amount at most to a privilege and a convenience, different in kind from the fundamental right to vote itself.[4] No part of the challenged procedures burden that latter fundamental right; to the contrary, the entire mail ballot scheme *expands* the franchise by providing voters with an additional and convenient option for voting. And voters whose absentee ballots or ballot applications are rejected, whether for signature issues or because of

_____

[4] As an initial matter, even these two interests are not equal; at least one court has concluded that although an interest in casting an absentee ballot is a protectable interest, the interest in *receiving* a ballot—*i.e.*, having an application accepted—is not. *See Zessar v. Helander*, 2006 U.S. Dist. LEXIS 9830 (N.D. Ill. 2006), *vacated as moot*, 536 F.3d 788 (7th Cir. 2008).

other deficiencies, can still vote, either in person or by correcting the deficiency with another ballot application or ballot.[5]  In other words, the private interest here is not "substantial" because the rare individuals who could be deprived of the interest at stake would *not* be deprived of the ability to vote—only the convenience of voting by mail.

*Second*, the statutory procedures already minimize the risk of erroneous deprivation both as to the absentee ballot application and the ballot itself.  In both instances, the statutes provide for prompt notice to the voter *and* an unlimited ability to cure the deficiency by submitting another application or ballot.  In addition, in Gwinnett County, where Plaintiffs appear to have heightened concerns due to "news reports," all rejections for questionable signatures are given a second layer of review by a team of three experienced current and former directors of election. (Ledford Decl., *GMVP* Doc. 23-1 ¶ 15).  Moreover, the risk of erroneous deprivation appears to be demonstrably low: for instance, in Gwinnett County, only nine absentee ballots have been rejected due to signature mismatch thus far. (Ledford Decl., *GMVP* Doc. 23-1 ¶ 18.)

---

[5] Early voting began in Georgia on October 15, 2018 and will continue through Nov. 2, 2018.  O.C.G.A. § 21-2-385(d)(1).  While some counties have early voting on multiple Saturdays, all counties will have early voting on Saturday, Oct. 27, 2018.  *Id.*

Additional safeguards, such as those requested by Plaintiff or imposed by this Court, will add little value.  Plaintiffs do not explain how a "hearing" to determine the validity of a voter's signature, where the voter would presumably have to appear, would be any more beneficial to the voter than merely correcting the deficiency with the ballot or application, or showing up at the county election office with identification and either voting in person or getting another absentee ballot. Requiring the state to conduct hearings or other additional process regarding a voter's identity is completely unnecessary since that simple verification of identity can be accomplished by the voter simply showing up at the county election office.  The same goes for this Court's new appeal process.

*Third*, the State has a compelling interest in the orderly administration of elections and in preventing fraud.  *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006); *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1353 (11th Cir. 2009) (quoting *Crawford v. Marion County Election Bd.*, 553 U.S. 181, 194-195 (2008)). The Court's injunction harms that interest by permitting a voter "to send or rely upon a duly authorized attorney or attorney in fact to present proper identification" to resolve a signature discrepancy.  *GMVP* Doc. 26 ¶ 2.  Allowing individuals other than the voter to "confirm" the voter's identity merely by having the voter's identification

plainly introduces a risk of fraud—particularly absent any kind of oath or affidavit requirement for the "attorney" presenting the voter's identification.

In addition, "the fiscal and administrative burdens" entailed by the additional process this Court's injunction would require are substantial. *J.R. v. Hansen*, 736 F.3d 959, 966 (11th Cir. 2013). Ensuring statewide compliance with the injunction's requirements would require other significant administrative burdens, including significant changes to how at least some counties track absentee ballot rejections; changes to the systems for tracking absentee ballot voters; and more. *See* Harvey Supp. Decl. ¶ 4–7, *GMVP* Doc. 31-1.[6] Moreover, creating a new right of appeal for a certain subset of provisional ballots as this Court's injunction requires burdens not only county election officials but also state courts—whose jurisdiction this Court's injunction now purports to expand to hear this new class of appeal, presumably on an expedited basis post-election. *GMVP* Doc. 26 ¶ 2. This appeal requirement, given the timelines generally required for appeals under the statute the Court has borrowed to set out the procedure for appeals, also threatens counties' ability to meet their certification deadline. Harvey Supp. Decl. ¶ 3, *GMVP* Doc. 31-1. This Court's injunction order attempts to rectify that significant flaw by setting out that unresolved

---

[6] The order's requirement that election officials send rejection notices via electronic means when available additionally burdens county election officials, who will have to determine on a case-by-case basis whether individuals have provided email addresses for such notices. *GMVP* Doc. 26 ¶ 1.

appeals "shall not require recertification of the election results unless those votes would change the outcome of the election."  *GMVP* Doc. 26 ¶ 1.  But this only introduces a new problem: given that this appeal requirement is brand new, there is no system or reporting requirement in place for determining whether the number of ballots subject to unresolved appeals *across the state* is high enough to potentially change the outcome of the election.

Plaintiffs' characterization of their requested relief as "minimal," *see GMVP* Doc. 1 ¶ 8, underscores their misunderstanding of both the purpose and consequences of a challenge to a voter's qualification to vote *any* ballot, and the simple verification of one's identity.  A hearing is required, and afforded, to any voter whose *qualification* to vote, in any manner, is challenged.  O.C.G.A. § 21-2-230(g).  But the rejection of an absentee ballot is not a challenge to a voter's qualifications, but the voter's identity; a matter which the voter can easily cure with identification.  Importantly, challenges to a voter's qualifications are rare, but many voters choose to vote by absentee ballot.  Requiring a hearing would place additional burdens on the already heavily taxed election officials administering the election.  *See, e.g.*, Ledford Supp. Decl. ¶ 9, *GMVP* Doc. 30-1 (indicating that Gwinnett County's elections staff is already "at their maximum capacity" preparing for the election, and that providing "anything more than a mailed notification to voters about the status of their ballot"

after the election, when the staff "must process all cast provisional ballots and work quickly toward final certification" would be "burdensome").

In its analysis of the *Mathews* factors, this Court expressed concern for "a category of absentee voters who vote by mail because they physically *cannot* show up in person," whether because of a "physical infirmity" or otherwise. (*GMVP* Doc. at 24, 25.)  To the extent that analysis might turn out differently for that category of voters—*e.g.*, if it could be shown that the interest in voting by mail is significantly stronger or the value of additional process significantly higher for such voters—that might perhaps afford a potential basis for an *as-applied* challenge to the statute brought by voters that fall within that category.  But as this Court acknowledged, the only procedural due process challenge in this case is a facial challenge.  Showing that the process afforded may not be sufficient for only a subset of voters does not meet the high standard for proving a facial challenge, that is, "that the law is unconstitutional in all of its applications."  *Washington State Grange*, 552 U.S. at 449.  Thus, pointing out conceivably stronger interests of this category of voters in additional process does not support the Court's conclusion that Plaintiffs are likely to succeed on their facial procedural due process challenge.

None of the cases Plaintiffs or this Court rely on support requiring the additional process outlined in this Court's preliminary injunction.  Most notably,

14

unlike Georgia's statute, the state statutes in each of those cases did not even afford notice to the voter until *after* the election, *if at all*.

In *Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354, 1357-1358 (D. Ariz. 1990), which did not specifically address a signature match ballot component, the court reviewed a statute where an "Absentee Election Board" determined whether each absentee ballot counted and the voter was never provided any notice, even post-election.  The district court, not surprisingly, found a scheme that did not allow a voter notice of the disqualification, or an opportunity to fix the problem even for future elections, problematic.  *Id.* at 1358 ("The disqualified voter may never ascertain the justification for the rejection of their vote in order to cure the defect for future eligibility.")

In *Saucedo v. Gardner*, 2018 U.S. Dist. LEXIS 136895 (D. N.H. 2018), the New Hampshire state statute at issue provided that absentee ballots were not reviewed until election night, and *then* signatures on the ballots were compared to the signatures on the absentee ballot applications.  *Id.* at 9-10.  Like Arizona, New Hampshire provided no notice to the voter even *after* the election.  *Id*. at 10-11. Importantly, the New Hampshire statute provided additional reasons a ballot might be rejected, such as not including *any* signature or otherwise improperly executing the affidavit on the ballot.  *Id.* at 10.  Nonetheless, the court only found that the signature

match provision, with *no notice* to the voter either before or after the election, violated procedural due process.  *Id.* at 44-45.

In *Zessar v. Helander*, 2006 U.S. Dist. LEXIS 9830 (N.D. Ill. 2006), *vacated as moot*, 536 F.3d 788 (7th Cir. 2008), again the statute at issue provided no pre-election notice to any voter whose ballot was rejected.  And again, the matching of a signature on the ballot envelope against the voter's registration record did not take place until the night of the election.  *Id.* at * 6-7.  In addition, the statute provided for notice to the voter only *after* a twenty-one (21) day, post-election, period for recounts.  *Id.* at 8.  The court held that voters whose absentee ballot applications had been approved had a state conferred liberty interest protected by procedural due process, and recognized that absentee ballot applicants *did not*.  *Id.* at * 17-19.  "The right to receive an absentee ballot is not the same as the right to vote."  *Id.* at * 17. However, once the state has approved the absentee ballot application, "absentee voters are entitled to [procedural] due process protection."  *Id.* at * 19.

In *Florida Democratic Party v. Detzner*, 2016 U.S. Dist. LEXIS 143620 at *5 (N.D. Fl. 2016), the challenged statutes provided that if a voter  mailed in an absentee ballot, but forgot to sign the oath, the voter could cure the deficiency up until 5 pm the day before the election by providing another oath and photo identification. However, if the voter signed the oath, that signature was matched against the voter's

registration records and the ballot was rejected *without notice* to the voter or any opportunity to cure. *After* the election, the voter would be notified and sent a new voter registration form. *Id.* at *19. The district court analyzed the statute under the *Anderson* and *Burdick* line of cases and found the system irrational because it allowed voters to cure some deficiencies, up to 5 pm the day before the election, but not a deficiency as to the match of the signature. *Id.* at 21. The district court held that the same cure period, *i.e.*, up to 5 pm on the day before the election, should apply to voters whose ballots were rejected due to the signature non-match. *Id.* at 28-29. Importantly, the *notice* due to voters is that provided in the statute for other deficiencies, that election officials "shall, on behalf of the county canvassing board, notify each elector whose ballot was rejected…." *Id*. There was no requirement of any specific method of notification or even standard by when notice had to be accomplished.

Finally, in *La Follete v. Padilla*, CPF-17-515931, slip op. at 2 (Cal. Super. Ct. Mar. 5, 2018), the challenged statute, like Florida's, provided that if a voter failed to sign the absentee ballot they were provided notice of the *rejected* ballot and an opportunity to cure prior to the certification of the election. *Id*. However, like Florida, if the absentee ballot was rejected for failure to match the signature, the voter received no notice, even *after* the election. *Id*. The California court, relying largely

on *Zessar,* held that the state conferred right to vote absentee was due procedural due process protection. *Id.* at *4-6.

Far from supporting imposition of additional procedural requirements, these cases highlight the relative strength of the additional measures Georgia already provides to ensure that would-be absentee voters have every opportunity to use that convenient option while still safeguarding the integrity of Georgia's elections—in particular, prompt notice of deficiencies and ability to cure right up until election day. In addition, it is telling that even in these cases, where courts found violations of due process, no court required a hearing, much less the appeal rights this Court's injunction requires*,* to resolve the signature issues on a ballot. Even assuming an individual's interest in voting by mail rather than in person is subject to federal due process, due process does not require such substantial procedures as these to protect an interest in the state-conferred privilege and convenience of not visiting a polling place in person.

### B.   The State Will Be Irreparably Harmed Absent A Stay.

Along with likelihood of success on the merits, whether the stay applicant will be irreparably injured absent a stay is a "most critical" factor in the analysis whether to grant a stay pending appeal. *Hand*, 888 F.3d at 1207. That factor strongly favors granting a stay. "Any time a State is enjoined by a court from effectuating statutes

enacted by representatives of its people, it suffers a form of irreparable injury." *Id.*

(quoting *Maryland v. King*, 567 U.S. 1301, 1301 (2012) (Roberts, C.J., in chambers)

(quotations omitted)).  Especially so in the election context; the Supreme Court has

repeatedly recognized the harm caused by upsetting a state's election process with

last minute changes to its process.  *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006);

*Benisek v. Lamone*, 138 S. Ct. 1942 (2018).  The State "has a substantial interest in

avoiding chaos and uncertainty in [statewide] election procedures, and likely should

not be forced to employ" a set of new, ad hoc procedures "created on an artificial

deadline."  *Id.*  This Court should be "reluctant to upset the system now in place—

particularly since [its] order creates so truncated a schedule—when there is a good

chance [its] order may be overturned, and the system would need to be changed still

again….  Put another way, there is wisdom in preserving the status quo ante until" the

Eleventh Circuit "has had an opportunity on full briefing to come to grips" with the

constitutional issues raised in this case.  *Id.*

    **C.**    **Issuing a Stay Will Not Substantially Injure the Other Parties.**

    A stay pending appeal of this Court's preliminary injunction likely would not

affect the Plaintiffs' interests in any meaningful way.  During the pendency of an

appeal, the organizational plaintiffs seem unlike likely to change the level of

resources committed to voter education whether or not the Court's new procedures

are in place.  If a stay is granted, those plaintiffs would presumably continue their efforts to inform voters about the current processes; if not, they would presumably need to inform voters about the new processes ushered in by this Court's injunction. As for the individual plaintiffs in *Martin*, none have alleged any facts demonstrating that any would even be affected by the new processes, or that they otherwise would not be able to have their votes counted in this election—whether by completing the mail ballot process or by voting in person—but for the Court's injunction.  The Plaintiffs' interests in an immediately effective preliminary injunction thus pale in comparison to the harm to the State absent a stay.  *See Ledford v. Comm'r, Georgia Dep't of Corr.*, 856 F.3d 1312, 1315 (11th Cir.) (considering whether "the threatened injury outweighs the harm the [stay] would cause the other litigant").

### D.    Granting a Stay Is in the Public Interest.

Staying this Court's preliminary injunction is in the public interest. "Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell*, 549 U.S. at 4.  Putting this injunction into effect in the middle of the 2018 general election after highly accelerated proceedings will undermine that confidence.  Each of Georgia's 159 counties have started early in-person voting and they have already trained all of their personnel on *current* election processes.  Adding new, ad hoc processes immediately to the mix risks

introducing uncertainty and confusion across the state, and it is sure to further strain each county's resources.  *See* Ledford Decl. ¶¶ 19-23, *GMVP* Doc. 23-1.  Granting a stay will assure the public that both the judiciary and the State will "ensur[e] proper consultation and careful deliberation" before disrupting the election process.  *Hand*, 888 F.3d at 1215.  This is especially important in light of the compelling interest the absentee ballot procedures protects: "Georgia's interest in preventing election fraud that 'provides a sufficient justification for carefully identifying all voters participating in the election process.'"  *Common Cause/Georgia*, 554 F.3d at 1353 (quoting *Crawford*, 553 U.S. at 194-195).

## CONCLUSION

For the above reasons, this Court should grant a stay pending appeal of its order granting a preliminary injunction.

Respectfully submitted,

CHRISTOPHER M. CARR
Attorney General                112505

ANNETTE M. COWART      191199
Deputy Attorney General

ANDREW A. PINSON         584719
Solicitor General

/s/ Russell D. Willard
RUSSELL D. WILLARD     760280
Senior Assistant Attorney General

/s/ Cristina M. Correia
CRISTINA M. CORREIA    188620
Senior Assistant Attorney General

/s/ Elizabeth A. Monyak
ELIZABETH A. MONYAK  005745
Senior Assistant Attorney General

Attorneys for Secretary of State Brian Kemp

Please address all
Communication to:
CRISTINA CORREIA
Senior Assistant Attorney General
40 Capitol Square SW
Atlanta, GA  30334
ccorreia@law.ga.gov
404-656-7063
404-651-9325

**Certificate of Compliance**

I hereby certify that the forgoing motion for a stay pending appeal was prepared in 14-point Times New Roman in compliance with Local Rules 5.1(C) and 7.1(D).

/s/Cristina Correia
Cristina Correia

**Certificate of Service**

I hereby certify that on October 25, 2018, I electronically filed this Notice of Appearance with the Clerk of Court using the CM/ECF system which will automatically send e-mail notification of such filing to the following attorneys of record:

Sean J. Young
ACLU Foundation of Georgia, Inc.
P.O. Box 77208
Atlanta, GA  30357

Dale E. Ho
ACLU
125 Broad Street, 18th Floor
New York, NY  10004

Brian R. Dempsey
Richard A. Carothers
Carothers & Mitchell, LLC
1809 Buford Highway
Buford, GA  30518

Bryan P. Tyson
Frank Strickland
Strickland Brockington Lewis, LLP
1170 Peachtree Street, Ne Suite 2200, Midtown Prosceium
Atlanta, GA  30309-7200

Bruce P. Brown
Bruce P. Brown Law
Suite 6
1123 Zonolite Road, Ne
Atlanta, GA  30306

John Powers
Lawyers' Committee for Civil Rights
   Under Law
1401 New York Avenue, Suite 400
Washington, DC  20005


I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants:  NONE

     This 25th d day of October, 2018.

/s/Cristina Correia
Cristina Correia    188620
Senior Assistant Attorney General
40 Capitol Square SW
Atlanta, GA  30334
ccorreia@law.ga.gov
404-656-7063
404-651-9325
