IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |
|---|---|
| GEORGIA MUSLIM VOTER PROJECT, ASIAN-AMERICANS ADVANCING JUSTICE-ATLANTA, and BETTY J. JONES, on behalf of herself and all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> BRIAN KEMP, in his official capacity as the Secretary of State of Georgia; and GWINNETT COUNTY BOARD OF VOTER REGISTRATION AND ELECTIONS, on behalf of itself and all others similarly situated, <br><br> Defendants. | No.: 1:18-cv-04789-LMM |

## FIRST AMENDED COMPLAINT

### THE NATURE OF THE CASE

1.      The right to vote is sacred and fundamental. However, under Georgia

law, county elections officials are required to reject all absentee ballots whose

signature "does not appear to be valid" because the signature allegedly does not

match the signature on file. When these rejections occur, voters are not provided

any pre-rejection notice or an opportunity to be heard or to otherwise ensure that

1

their absentee ballot will be counted. The elections officials' determination is final, without any review or appeal. O.C.G.A. § 21-2-386(a)(1)(B)-(C). This is a violation of the Due Process Clause of the Fourteenth Amendment.

2.    Though voters are theoretically permitted to cure this rejection by trying to successfully navigate the absentee voting process a second time or voting in-person, Ga. Admin. Code § 183-1-14-.09(2), this cure opportunity is illusory for many would-be voters. Even for willing voters who are able to try the absentee process again, there is no reason to believe that a voter's signature will be found to match on a second try. In-person voting is denied to absentee voters who cannot vote in-person, whether because of physical disability, lack of transportation, or out-of-town travel. It is also denied to the many voters do not receive notice of their rejection until on or after Election Day, when it is too late to vote in-person to cure the error. Because there is no statutory time limit on when county officials must process absentee ballots after they are received, nor a statutory time limit as to when county officials must send notices of rejection, would-be voters who are disenfranchised include not just those who cast absentee ballots near Election Day, but also some who cast ballots well in advance of Election Day. *See* O.C.G.A. § 21-2-386(a)(1)(C) (rejection notices shall be sent "promptly," without specifying when).

3.      Similarly, voters who submit *applications* for an absentee ballot will also have their applications rejected on the basis of an alleged signature mismatch, without pre-rejection notice or an opportunity to be heard. O.C.G.A. § 21-2-381(b)(1)-(3).

4.      The act of signing one's name is often viewed as a rote task, a mechanical exercise yielding a fixed signature. A person's signature, however, may vary for a variety of reasons, both intentional and unintentional. Unintentional factors include age, physical and mental condition, disability, medication, stress, accidents, and inherent differences in a person's neuromuscular coordination and stance. Variants are more prevalent in people who are elderly, disabled, or who speak English as a second language.

5.      For the most part, signature variations are of little consequence in a person's life. But in the context of absentee voting, these variations become profoundly consequential under Georgia's signature-match requirement law.

6.      Georgia law does not require elections officials to receive training in handwriting analysis or signature comparison, and no statue or regulation provides functional standards to distinguish the natural variations of one writer from other variations that suggest two different writers.

3

7.     There are already processes in place that provide due process for other voters in similar circumstances. For absentee voters whose ballots are challenged on grounds that the voter is allegedly unqualified to vote, Georgia law provides notice, a hearing "on an expedited basis," including after Election Day but prior to the certification of the consolidated returns 14 days after Election Day, O.C.G.A. § 21-2-499, and an opportunity for judicial appeal to resolve whether that ballot should be counted. *See* O.C.G.A. § 21-2-230(g). For in-person voters whose identity cannot be verified at the polling place because they are unable to provide photo identification, such voters will have their ballot counted if they provide photo identification up to three days after Election Day. *See* O.C.G.A. § 21-2-417(b). It would not be burdensome to apply these same procedures to absentee voters whose ballots are questioned on the basis of an alleged signature mismatch.

8.     Although the stakes of this case are high, the requested remedy is minimal, as it simply adapts the above existing procedures to the voters at issue here. Plaintiffs ask that, in addition to the existing cure provisions, absentee voters whose ballots were rejected due to signature mismatch be provided up to three days after Election Day, or three days after they receive notice of their signature match rejection, whichever is later, to confirm their identity through photo

identification (via e-mail, fax, mail, or in-person), or otherwise resolve the alleged signature discrepancy in a hearing "on an expedited basis."

9.      Plaintiffs further ask that this procedure apply to voters whose absentee ballot applications are rejected due to signature mismatches, limited to the period of time during which absentee ballot applications may be requested.

## JURISDICTION AND VENUE

10.     This is a civil and constitutional rights action arising under 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

11.     Venue in this Court is proper under 28 U.S.C. § 1391 because the events giving rise to Plaintiffs' claims arose in this district and division. The Defendant Secretary of State, and the proposed Defendant class representative Gwinnett County Board of Voter Registration and Elections are both located within this district and division.

## PARTIES

12.     Plaintiff Georgia Muslim Voter Project ("GMVP") is a civic organization whose mission is to assist in registering voters and increase voter engagement and turnout. GMVP is particularly active in Gwinnett County, which has one of the highest populations of United States citizens who are Muslim among

the State of Georgia. As a result of O.C.G.A. § 21-2-386(a)(1)(B)-(C), which fails to provide due process to absentee voters whose signatures allegedly do not match, and O.C.G.A. § 21-2-381(b)(1)-(3), which fails to provide due process to absentee ballot applicants whose signatures allegedly do not match, and in response to a recent news article indicating higher rates of rejection in Gwinnett County, GMVP must now divert more resources towards warning voters about this risk, especially voters who vote absentee closer to Election Day. GMVP must also divert resources towards following up with voters to explore any possibility of ensuring that their ballot will be counted, such as placing calls to county registrars or expending more resources towards facilitating in-person voting to compensate for the risk of absentee ballots not being counted. These resources are diverted away from its regular voting and voter registration activities.

13.  Plaintiff Asian-American Advancing Justice-Atlanta ("Advancing Justice-Atlanta") is a civic organization whose mission includes increasing civic engagement and voter turnout among Asian Americans in Georgia by, among other activities, assisting with registering voters. Advancing Justice-Atlanta is particularly active in Gwinnett County, which has one of the highest populations of United States citizens who are Asian-American in the State of Georgia. As a result of O.C.G.A. § 21-2-386(a)(1)(B)-(C), which fails to provide due process to

absentee voters whose signatures allegedly do not match, and O.C.G.A. § 21-2-381(b)(1)-(3), which fails to provide due process to absentee ballot applicants whose signatures allegedly do not match, and in response to a recent news article indicating higher rates of rejection in Gwinnett County especially among Asian Americans, Advancing Justice-Atlanta must now divert more resources towards warning voters about this risk, especially voters who vote absentee closer to Election Day. Advancing Justice-Atlanta must also divert resources towards following up with voters to explore any possibility of ensuring that their ballot will be counted, such as placing calls to county registrars or expending more resources towards facilitating in-person voting to compensate for the risk of absentee ballots not being counted. These resources are diverted away from its regular voting and voter registration activities.

14.    Plaintiff Betty J. Jones is 74 years old and a registered Georgia voter who lives in DeKalb County. She has circulation problems that make it very difficult for her to stand in long lines or walk and to vote in-person. In or around September 2018, she submitted an absentee ballot application which was rejected due to a signature mismatch. She submitted additional forms but as of October 29, 2018, with a week left before Election Day, she has yet to receive an absentee ballot. She is concerned that even if she submits an absentee ballot, it may not be

counted for the same signature reason that her absentee ballot application was rejected.

15.     Defendant Brian J. Kemp, who is the Secretary of State and the chief elections official of the State, is responsible for enacting elections statutes and routinely issues guidance to the county registrars of all 159 counties on various elections procedures.

16.     The Defendant Gwinnett County Board of Voter Registration & Elections, and the 159 county boards of registrars or absentee ballot clerks[1] whom it represents in Plaintiffs' proposed class, is statutorily responsible for implementing the procedures set forth in O.C.G.A. § 21-2-386(a)(1)(B)-(C) and O.C.G.A. § 21-2-381(b)(1)-(3). They are also responsible for implementing the statutes that provide due process for voters in similar circumstances, whose ballots are not initially counted for various reasons. *See* O.C.G.A. §§ 21-2-230(g); § 21-2-417(b).

---

[1] Many counties combine their board of registrars and board of elections, which technically have separate responsibilities, into one entity called the "Board of Registration & Elections" (or some combination of the terms), responsible for both entities' duties. For the sake of simplicity, Plaintiffs use the statutory phrase "board of registrars" or "county registrars." This term will also be used to include "absentee ballot clerk." O.C.G.A. § 21-2-380.1.

**FACTUAL ALLEGATIONS**

17.     At stake is the sacred, constitutional right to vote. "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964).

**<u>Reasons Signatures Often Do Not Match</u>**

18.     The act of signing one's name is often viewed as a rote task, a mechanical exercise yielding a fixed signature. A person's signature, however, may vary for a variety of reasons, both intentional and unintentional. Unintentional factors include age, physical and mental condition, disability, medication, stress, accidents, and inherent differences in a person's neuromuscular coordination and stance. Variants are more prevalent in people who are elderly, disabled, or who speak English as a second language.

19.     For the most part, signature variations are of little consequence in a person's life. But in the context of absentee voting, these variations become profoundly consequential under Georgia's signature-match requirement law.

## **Signature Matching: Absentee Ballot Application Stage**

20.    Georgia allows a voter to cast an absentee ballot through the mail. Notwithstanding the "absentee" moniker, any registered voter may vote absentee regardless of whether they have an excuse for not being present on Election Day.

21.    To vote by absentee ballot, a voter must first submit an absentee ballot application via mail, fax, e-mail, or in-person. *See* O.C.G.A. § 21-2-381. The application can be submitted as early as 180 days and as late as the Friday before Election Day (since absentee ballots cannot be mailed the day before Election Day). *See* O.C.G.A. §§ 21-2-381(a)(1)(A); 21-2-384(a)(2).

22.    When an absentee ballot application is received, the county registrar determines whether the voter is eligible. Included in the process is a comparison of the signature on the absentee ballot application with the signature on file. O.C.G.A. § 21-2-381(b)(1) ("In order to be found eligible to vote an absentee ballot by mail, . . . , the registrar or absentee ballot clerk shall . . . compare the signature or mark of the elector on the application with the signature or mark of the elector on the elector's voter registration card.").

23.    If the registrar unilaterally deems the signatures not to match, "the board of registrars shall deny the application by writing the reason for rejection in

the proper space on the application and shall promptly notify the applicant in writing of the ground of ineligibility." O.C.G.A. § 21-2-381(b)(2)(3).

24.    The statutes do not provide the absentee ballot applicant pre-rejection notice or an opportunity to be heard or otherwise explain the alleged mismatch.

25.    Though voters may theoretically apply a second time, there is no reason to believe that the same signature will not be rejected again, and that a second application would not be futile. And for voters who apply for an absentee ballot closer to Election Day, they will not have another opportunity to apply again.

26.    At least 467 absentee ballot applications have been rejected thus far for the 2018 general election, with many of the rejections concentrated in Gwinnett County.

27.    If the applicant's eligibility is confirmed, the registrar mails an absentee ballot to the voter (with exceptions not relevant here). O.C.G.A. § 21-2-381(b)(2). Such ballots are mailed from 49 days before Election Day up to the Friday before Election Day. O.C.G.A. § 21-2-384(a)(2).

## Signature Matching: Absentee Ballot Stage

28.    Once the absentee voter receives an official absentee ballot, they receive two envelopes. The completed absentee ballot must be placed in the

smaller of the two envelopes. The back of the larger envelope contains on oath swearing to eligibility, among other matters, and a line for the voter's signature. O.C.G.A. § 21-2-384(c)(1). The smaller envelope must be placed in the larger and returned to the county registrar.

29.     Once the absentee ballot is received, the county registrar "shall compare the signature or mark on the oath with the signature or mark on the absentee voter's voter registration card or the most recent update to such absentee elector's voter registration card and application for absentee ballot or a facsimile of said signature or mark taken from said card or application." O.C.G.A. § 21-2-386(a)(1)(B).

30.     The purpose of signature-matching is to verify the absentee voter's identity. Under Georgia law, absentee voters are exempt from the requirement to provide photo identification in order to vote.

31.     If the "signature does not appear to be valid, . . . the registrar or clerk shall write across the face of the envelope 'Rejected,' giving the reason therefor. The board of registrars or absentee ballot clerk shall promptly notify the elector of such rejection." O.C.G.A. § 21-2-386(a)(1)(C).

32.     There is no procedure by which a voter can contest a registrar's decision that the voter's two signatures do not match, nor are there any additional layers of review of that decision. In other words, the registrar's decision is final.

33.     There is no statutory time limit on when county officials must process absentee ballots after they are received, nor a statutory time limit as to when county officials must send notices of rejection, would-be voters who are disenfranchised include not just those who cast absentee ballots near Election Day, but also some who cast ballots well in advance of Election Day. *See* O.C.G.A. § 21-2-386(a)(1)(C) (rejection notices shall be sent "promptly," without specifying when).

34.     Nearly 100 absentee ballots have been rejected thus far for the 2018 general election.

## Elections Officials Are Not Handwriting Experts

35.     Georgia law puts elections officials in the difficult position of acting as handwriting experts. Needless to say, elections officials are laypersons who do not undergo formal handwriting-analysis education or training.

36.     On its face, the signature matching requirement for both absentee ballots and absentee ballot applications gives no guidance on the questions that inevitably arise in applying the requirement, including what stylistic variations

13

suggest that two signatures were made by different individuals, and what threshold number of variations is required to conclude that the signature on the oath or application does not appear to be executed by the same person.

37.     No statute or, any regulation requires registrars to consider extrinsic evidence that might confirm the identity of the absentee voter or applicant.

### Other Voters are Provided Due Process

38.     There are already processes in place that provide due process for other voters in similar circumstances.

39.     For absentee voters whose ballots are challenged on grounds that the voter is allegedly unqualified to vote, Georgia law provides notice, a hearing "on an expedited basis," and an opportunity for judicial appeal to resolve whether that ballot should be counted. *See* O.C.G.A. § 21-2-230(g).

40.     In-person voters whose identity cannot be verified at the polling place because they are unable to provide photo identification will have their ballot counted if they provide photo identification up to three days after Election Day. *See* O.C.G.A. § 21-2-417(b).

41.     It would not be burdensome to apply these same procedures to absentee voters whose ballots are questioned on the basis of an alleged signature mismatch, as well as registered voters whose absentee ballot applications are

14

questioned on the basis of an alleged signature mismatch. Specifically, absentee voters whose ballots were rejected due to signature mismatch should be provided up to three days after Election Day, or three days after they receive notice of their signature match rejection, whichever is later, to confirm their identity through photo identification (via e-mail, fax, mail, or in-person), or otherwise resolve the signature discrepancy in a hearing "on an expedited basis." The same procedure should be provided to absentee ballot applicants whose applications are rejected due to a signature mismatch, limited to the period of time during which absentee ballots may be requested.

## **Plaintiff Class Action Allegations**

42.     Certifying a plaintiff class action of absentee voters unable to cure their rejection by voting in-person is unnecessary with respect to Plaintiffs' facial challenge, and it is also unnecessary because the Plaintiff organizations have standing to vindicate the rights of individual voters.

43.     To the extent this Court believes that class certification is necessary, Plaintiffs seek certification of a plaintiff class of all registered Georgia voters whose absentee ballot application or absentee ballot has been, or will be, rejected because of an alleged signature mismatch. If necessary, Plaintiffs also seek certification of a plaintiff subclass of all registered Georgia voters whose absentee

ballot application or absentee ballot has been, or will be, rejected because of an alleged signature mismatch, and who are unable to cure their rejection by voting in person. Plaintiff Betty J. Jones would be the class and subclass (hereinafter "class") representative.

44.     Joinder would be impracticable because there are hundreds of voters in every election whose absentee ballot applications or absentee ballots are rejected due to a signature mismatch, and the class is fluid because and more and more voters will become class members with every passing election. All class members share a common legal question: does the deprivation of their right to have their absentee ballot application approved or absentee ballot counted result in a due process violation? The class representative's claims are typical of the claims of the class because she faces a realistic threat of having her absentee ballot application or absentee ballot rejected without due process due to a signature mismatch. As an avid voter, the class representative and her experienced counsel will also fairly and adequately protect the interests of the class.

45.     The plaintiff class should be certified because "prosecuting separate actions by or against individual class members would create a risk of . . . inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the

class." Fed. R. Civ. P. 23(b)(1)(A). Filing countless separate, identical lawsuits could result in some voters receiving due process while others do not, which would be unacceptable.

46.     The plaintiff class should also be certified pursuant to Fed. R. Civ. P. 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole. Defendants are simply charged with enforcing the challenged statute on all voters, and Plaintiffs seek to change that conduct as to all voters.

## **Defendant Class Action Allegations**

47.     Certifying a defendant class action is unnecessary because an order enjoining the Secretary of State will have the effect of enjoining all 159 county boards of registrars. The Secretary of State's Office routinely issues guidance to county registrars statewide, who follow the Office's guidelines.

48.     Nonetheless, to the extent the Court deems it necessary to join all the county boards of registrars as parties to this suit, Plaintiffs seek certification of a defendant class of all 159 Georgia county boards of registrars, with the Gwinnett County Board of Voter Registration & Elections as the defendant class

17

representative, pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(1) or (b)(3).

49.     Joinder would be impracticable because there are 159 county boards of registrars. All county boards of registrars will share a common set of defenses available in this challenge to the constitutionality of O.C.G.A. § 21-2-386(a)(1)(B)-(C) and O.C.G.A. § 21-2-381(b)(1)-(3). Because all the county boards of registrars are simply doing what the statute requires, their defenses will not vary based on individual facts. For the same reasons, the claims of proposed class representative Gwinnett County Board of Voter Registration & Elections will be typical of those of the other county boards of registrars. The Gwinnett County Board of Voter Registration & Elections will also be an adequate representative of the class. There is no conflict between Gwinnett County's board of registrars and other counties' boards, all of which operate independently. As the board of registrars in charge of one of the largest counties in Georgia, they will also have the best resources and experience necessary to litigate this matter.

50.     The defendant class should be certified because "prosecuting separate actions by or against individual class members would create a risk of . . . inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the

class." Fed. R. Civ. P. 23(b)(1)(A). Filing 159 separate, identical lawsuits could result in incompatible standards of conduct throughout of Georgia, where a person's voting rights differs depending on where they live. Such an outcome is unacceptable in our democracy.

51.     The defendant class may also be certified because "the questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The questions of law or fact not only predominate here, they constitute the *only* question at the center of this lawsuit: Are O.C.G.A. § 21-2-386(a)(1)(B)-(C) and O.C.G.A. § 21-2-381(b)(1)-(3) constitutional? Filing 159 separate, identical lawsuits would be a waste of judicial and government resources.

## CAUSES OF ACTION

### <u>COUNT ONE</u>

*O.C.G.A. § 21-2-386(a)(1)(B)-(C) Violates the Procedural Due Process Clause
under the Fourteenth Amendment*

52.     Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

53.     Section 1 of the Fourteenth Amendment to the United States Constitution prohibits states from depriving "any person of . . . liberty . . . without

19

due process of law." This due process principle protects the fundamental right to vote.

54.    O.C.G.A. § 21-2-386(a)(1)(B)-(C), by mandating the unilateral rejection of absentee ballots due to an alleged signature mismatch, violates the Due Process Clause by depriving affected individuals of their right to vote without adequate procedural due process, in the form of pre-rejection notice and an opportunity to be heard.

55.    Notice and an opportunity to be heard are already provided to other voters in similar circumstances. Absentee voters whose ballots are challenged due to alleged voter ineligibility receive notice and an opportunity to be heard before their ballot is rejected. *See* O.C.G.A. § 21-2-230(g). In-person voters whose ballots cannot be counted on Election Day due to lack of identity verification can provide photo identification confirming their identity within 3 days of Election Day to have their ballot counted. *See* O.C.G.A. § 21-2-417(b). It would not be burdensome to apply these same procedures to absentee voters with mismatched signatures.

56.    The fundamental right to vote is at stake, and the risk that even one person will be denied the right to cast an absentee ballot is too significant for the government to justify depriving all voters the same notice and opportunity to be heard that are already provided to other voters in similar circumstances.

57.     This challenge is both facial and as-applied.

## COUNT TWO

*O.C.G.A. § 21-2-381(b)(1)-(3) Violates the Procedural Due Process Clause under the Fourteenth Amendment*

58.     Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

59.     Section 1 of the Fourteenth Amendment to the United States Constitution prohibits states from depriving "any person of . . . liberty . . . without due process of law." This due process principle protects the fundamental right to vote.

60.     O.C.G.A. § 21-2-381(b)(1)-(3), by mandating the unilateral rejection of absentee ballot applications due to an alleged signature mismatch, violates the Due Process Clause by depriving affected individuals of their right to vote without adequate procedural due process, in the form of pre-rejection notice and an opportunity to be heard.

61.     Notice and an opportunity to be heard are already provided to other voters in similar circumstances. Absentee voters whose ballots are challenged due to alleged voter ineligibility receive notice and an opportunity to be heard before their ballot is rejected. *See* O.C.G.A. § 21-2-230(g). In-person voters whose ballots cannot be counted on Election Day due to lack of identity verification can provide

photo identification confirming their identity within 3 days of Election Day to have their ballot counted. *See* O.C.G.A. § 21-2-417(b). It would not be burdensome to apply these same procedures to absentee ballot applicants with mismatched signatures.

62.     The fundamental right to vote is at stake, and the risk that even one person will be denied the right to cast an absentee ballot is too significant for the government to justify depriving all voters the same notice and opportunity to be heard that is already provided to other voters in similar circumstances.

63.     This challenge is both facial and as-applied.

## COUNT THREE

*Violation of Equal Protection Clause under the Fourteenth Amendment*

64.     Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

65.     The Fourteenth Amendment protects the fundamental right to vote. *See Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). Pursuant to the *Anderson-Burdick* line of cases, the government cannot infringe upon the right to vote without adequate justification, and the greater the magnitude of the infringement, the stronger the justification must be.

66.     O.C.G.A. § 21-2-386(a)(1)(B)-(C), by mandating the unilateral rejection of absentee ballots due to an alleged signature mismatch, deprives individuals of their right to vote, a burden that is undoubtedly severe, especially when voters are given no pre-rejection notice or opportunity to resolve the mismatch or otherwise confirm their identity.

67.     O.C.G.A. § 21-2-381(b)(1)-(3), by mandating the unilateral rejection of absentee ballot applications due to an alleged signature mismatch, deprives individuals of their right to vote, a burden that is undoubtedly severe, especially when voters are given no pre-rejection notice or opportunity to resolve the mismatch or otherwise confirm their identity.

68.     The collective burdens imposed by these laws are severe.

69.     Notice and an opportunity to be heard are already provided to other voters in similar circumstances. Absentee voters whose ballots are challenged due to alleged voter ineligibility receive notice and an opportunity to be heard before their ballot is rejected. *See* O.C.G.A. § 21-2-230(g). In-person voters whose ballots cannot be counted on Election Day due to lack of identity verification can provided photo identification confirming their identity within 3 days of Election Day to have their ballot counted. *See* O.C.G.A. § 21-2-417(b). It would not be burdensome to

apply these same procedures to absentee voters or applicants with mismatched signatures.

70.    The government's interests are not justified in depriving absentee voters or applicants the same notice and opportunity to be heard that are provided to other similarly-situated voters.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand the following:

a)  That this Court issue a judgment declaring that O.C.G.A. § 21-2-386(a)(1)(B)-(C), is unconstitutional to the extent that it deprives absentee voters notice and an opportunity to be heard;

b)  That this Court issue a judgment declaring that O.C.G.A. § 21-2-381(b)(1)-(3), is unconstitutional to the extent that it deprives absentee ballot applicants notice and an opportunity to be heard;

c)  That this Court issue a temporary restraining order, preliminary injunction, and permanent injunction enjoining Defendants from enforcing these statutes to the extent that the statutes fail to provide absentee voters and absentee ballot applicants pre-rejection notice and a hearing or other opportunity to resolve the alleged mismatch or otherwise confirm their identity, e.g., through photo identification; specifically, Plaintiffs ask:

24

     i.    that absentee voters whose ballots were rejected due to signature mismatch be provided up to three days after Election Day, or three days after they receive notice of their signature match rejection, whichever is later, to confirm their identity through photo identification (via e-mail, fax, mail, or in-person), or otherwise resolve the signature discrepancy in a hearing on an expedited basis;

    ii.    that registered voters whose absentee ballot applications were rejected due to signature mismatch be provided an opportunity until the Friday before Election Day to confirm their identity through photo identification (via e-mail, fax, mail, or in-person), or otherwise resolve the signature discrepancy in a hearing on an expedited basis;

d)  That Plaintiffs be awarded attorneys' fees under 42 U.S.C. § 1988;

e)  That all costs of this action be taxed against Defendants; and

f)  That the Court award any additional or alternative relief as may be deemed appropriate under the circumstances.

                         Respectfully submitted,

this October 16, 2018

s/ Sean J. Young_____

Sean J. Young (Ga. Bar No. 790399)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF GEORGIA, INC.
P.O. Box 77208
Atlanta, GA 30357
770-303-8111 (phone)
770-303-0060 (fax)
syoung@acluga.org

Sophia Lin Lakin*
Dale E. Ho*
American Civil Liberties Union
125 Broad Street, 18th Floor
New York, NY 10004
212-519-7836 (phone)
slakin@aclu.org
dho@aclu.org
Attorneys for Plaintiffs

*Pro hac vice application forthcoming

Attorneys for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 16, 2018, I electronically filed the foregoing

with the Clerk of Court using the CM/ECF system. The Complaint will be served

on the above-named Defendants.

Date: October 16, 2018

s/ Sean J. Young_____

Sean J. Young (Ga. Bar No. 790399)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF GEORGIA, INC.
P.O. Box 77208
Atlanta, GA 30357
770-303-8111 (phone)
770-303-0060 (fax)
syoung@acluga.org