IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| RHONDA J. MARTIN, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| BRIAN KEMP, *et al.*, | : | CIVIL ACTION NO. |
| | : | 1:18-CV-4776-LMM |
| Defendants. | : | |

---

| | | |
|---|---|---|
| GEORGIA MUSLIM VOTER PROJECT, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| BRIAN KEMP, *et al.*, | : | CIVIL ACTION NO. |
| | : | 1:18-CV-4789-LMM |
| Defendants. | : | |

**ORDER**

This case comes before the Court on Defendant Brian Kemp's Emergency Motion for Stay Pending Appeal. GMVP Dkt. No. [33]; Martin Dkt. No. [27].

On October 25, 2018, this Court entered a temporary restraining order, directing the Secretary of State Brian Kemp to issue instructions to all county boards of registrars, boards of elections, election superintendents, and absentee clerks so that procedural due process could be afforded to absentee voters. GMVP Dkt. No. [32]. Secretary Kemp now moves this Court pursuant to Federal Rule of Civil Procedure 62(c) to stay this injunction pending appeal. For the reasons stated below, this motion is **DENIED.**

## I. LEGAL STANDARD

Federal Rule of Civil Procedure 62(c) governs the granting of a stay of an injunction pending appeal and provides in relevant part:

> While an appeal is pending from an interlocutory order or final judgment that grants, dissolves, or denies an injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights.

"A stay is not a matter of right, even if irreparable injury might otherwise result." Nken v. Holder, 556 U.S. 418, 434 (2009) (citing Virginian Railway Co. v. United States, 272 U.S. 658, 672 (1926)). "It is instead 'an exercise of judicial discretion,' and '[t]he propriety of its issu[uance] is dependent upon the circumstances of the particular case.'" Id. (internal citations omitted). The Court's discretion is guided

by sound legal principles that have been distilled into consideration of the following four factors:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

Hilton v. Braunskill, 481 U.S. 770, 776 (1987).

The movant bears a "heavy burden" and "must establish *each* of these four elements in order to prevail." Larios v. Cox, 305 F. Supp. 2d 1335, 1336 (N.D. Ga. 2004) (citing Siegel v. Lepore, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc)); see also Nken, 556 U.S. at 433–34 (2009) ("The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion.").

In addition, "[a]lthough the first factor (i.e., a strong showing of likelihood of success on the merits) is generally the most important, the movant need not always show that [it] probably will succeed on the merits of [the] appeal." Gonzalez ex rel. Gonzalez v. Reno, No. 00-11424, 2000 WL 381901, at *1 (11th Cir. Apr. 19, 2000) (citing Garcia-Mir v. Meese, 781 F.2d 1450, 1453 (11th Cir. 1986)). When the balance of the equities weighs in favor of granting the stay, the movant need only show a substantial case on the merits. Larios, 305 F. Supp. 2d at 1337. On the other hand, "[t]he more the balance of equities (represented by the other three factors) tilts in [the opposing party's] favor, the greater the movant's burden to shown a likelihood of success on the merits." Id.

In addition, the latter two factors (*i.e.*, harm to the opposing party and weighing the public interest) merge when the Government is the opposing party, such as in the case *sub judice*. Nken, 556 U.S. at 435.

**II.   DISCUSSION**

  **a.   Likelihood of Success on the Merits**

For the reasons stated in this Court's Order in this case, GMVP Dkt. No. [28], the Court finds that Secretary Kemp has not made a strong showing that he is likely to succeed on the merits. Specifically, the Court notes that a facial challenge is proper because the statutes at issue violate due process in all their applications. It is axiomatic that "[t]he fundamental requisite of due process at law is the *opportunity to be heard*." Goldberg v. Kelly, 397 U.S. 254, 267 (1970) (internal citation omitted) (emphasis added). The statutes at issue do not provide any opportunity to be heard on a ballot application or ballot rejection. See O.C.G.A. §§ 21-2-381, -386. Rather, as Secretary Kemp acknowledges, the statutes only provide for "prompt notice" and an ability "to cure the deficiency by submitting another application or ballot." GMVP Dkt. No. [33] at 10. But notice and an opportunity to cure by submitting a *new application or ballot* is not equivalent to the opportunity to be heard on the *initial issue of rejection*. Thus, the statutes plainly violate due process in all their applications.

With regard to Secretary Kemp's application of the Mathews factors, the Court disagrees with his assertion that the private interest at issue is light because absentee voting is simply "a privilege and a convenience." GMVP Dkt.

4

No. [33] at 9. As the Court previously explained, state-created statutory entitlements can trigger due process. See GMVP Dkt. No. [28] at 22 (citing Goldberg, 397 U.S. at 262 (1970)). Here, the State created a statutory scheme entitling qualified persons to cast absentee ballots, thereby conferring a statutory entitlement deserving of due process protections. As the Supreme Court explained in Paul v. Davis,

> It is apparent from our decisions that there exists a variety of interests which are difficult of definition but are nevertheless comprehended within the meaning of either "liberty" or "property" as meant in the Due Process Clause. Those interests attain this constitutional status by virtue of the fact that they have been initially recognized and protected by state law, and we have repeatedly ruled that the procedural guarantees of the Fourteenth Amendment apply whenever the State seeks to remove or significantly alter that protected status.

424 U.S. 693, 710-11 (1976). Accordingly, having conferred the entitlement, the State cannot withdraw the right to cast an absentee ballot without first adhering to the Fourteenth Amendment's guarantee of due process of law.

Turning to the remaining Mathews factors, Secretary Kemp has not made a "strong showing" that he is likely to succeed on the merits. The Court remains confident that the risk of rejecting qualified absentee voters is high, the additional procedures have great probative value, and the procedures required by the injunction are not so burdensome as to outweigh the state-conferred right to vote through the absentee process. See Dkt. No. [28] at 26 (quoting Saucedo v. Gardner, No. 17-cv-183-LM, 2018 WL 3862704, at *13 (D.N.H. Aug. 14, 2018)

("[A]dditional procedures further the State's interest in preventing voter fraud while ensuring that qualified voters are not wrongly disenfranchised.")).

Nor is the Court swayed by any of Secretary Kemp's objections to the additional procedural safeguards created by the injunction. Secretary Kemp first argues that requiring the state to conduct hearings (and an appeal process) to verify a voter's identity is "completely unnecessary since that simple verification of identity can be accomplished by the voter simply showing up at the county election office" or by requesting a new absentee application or ballot. GMVP Dkt. No. [33] at 11. This objection misses the mark. There is simply no guarantee that a voter whose ballot application or ballot has been rejected due to a signature mismatch will be able to provide a matching signature on a new application—particularly since signatures vary for a variety of benign reasons. See, e.g., Saucedo, 2018 WL 3862704, at *7 ("Unintentional factors [resulting in signature variation] include age, physical and mental condition, disability, stress, accidental occurrences, inherent variances in neuromuscular coordination and stance."). Thus, a hearing is absolutely necessary for the subset of absentee voters who vote by mail because they physically cannot show up in person to verify their identity or vote in person.

Next, Secretary Kemp argues that the provision in the injunction permitting a voter to "send or rely upon a duly authorized attorney or attorney in fact to present proper identification" introduces the risk of fraud, particularly because it lacks "any kind of oath or affidavit requirement." See GMVP Dkt. No.

6

[33] at 11-12. The Court is highly doubtful that injecting an attorney or an attorney in-fact—persons bound by legal and ethical obligations—into the voter verification process would increase the risk of fraud. Secretary Kemp also failed to suggest any such affidavit or oath procedure when the Court provided Secretary Kemp with the opportunity to do so *before* issuing the injunction. See GMVP Dkt. Nos. [28] at 29; [31] at 2. Indeed, Secretary Kemp's current request for a formal oath or affidavit is at odds with his earlier request for a "more informal and manageable process, of allowing voters to simply provide proof of identification . . . by faxing or emailing a copy of one's photo." GMVP Dkt. No. [31] at 2. As such, the Court is simply not persuaded that the injunction's attorney provision is more apt to induce voter fraud than the State's suggested procedure for confirming a voter's identity via fax or email.

Further, Secretary Kemp fails to recognize that the Court is not ordering the State to automatically verify a voter based on identification proffered by an attorney or attorney in-fact. The injunction leaves county elections officials free to conduct hearings as they see fit—so long as there remains a constitutionally adequate opportunity for a voter to be heard. While the injunction guards against erroneous rejections based on a signature mismatch, county elections officials still retain full discretion in verifying a voter's identity.

Secretary Kemp's argument that the injunction poses substantial "fiscal and administrative burdens" likewise lacks merit. See GMVP Dkt. No. [33] at 12. To begin, Secretary Kemp contends that ensuring statewide compliance with the

7

injunction's requirements will require "significant changes to how at least some counties track absentee ballot rejections; changes to the systems for tracking absentee ballots voters; and more." Id. But this concern is directly belied by the declaration of the Chair of the Chatham County Board of Registrars, Colin McRae. GMVP Dkt. No. [37-1] ¶ 2. For example, Mr. McRae explains that "slightly changing the way we categorize rejectees in the eNet system is easily doable." Id. at ¶ 9. Given that one of the most populous counties in Georgia has already stated that the injunction "does not really add any burdens to what we are already doing," the Court is not persuaded that the injunction imposes any substantial fiscal or administrative burdens. See id. ¶¶ 3, 10.

Additionally, Secretary Kemp avers that this appeal requirement is "brand new" and thus requires the State to create a system for tracking the number of unresolved absentee ballot appeals from scratch. GMVP Dkt. No. [33] at 13. In Secretary Kemp's view, then, the injunction will unduly burden county elections officials across the state by forcing them to hold hearings in the first instance and then track any appeals. But the Court has not conjured a new procedure from thin air—the injunction simply requires county elections officials to apply the already established procedures set forth in O.C.G.A. §§ 21-2-229(e), -419, -493 to the subset of absentee voters whose ballots are rejected due to a signature mismatch. And, as Secretary Kemp continues to insist that the number of absentee voters at risk of rejection based on a signature mismatch is quite low, the Court finds that the injunction's implementation of already existing

procedures does not impose intractable costs or burdens on county elections officials. Accordingly, Secretary Kemp has not met his burden in demonstrating a strong likelihood of success on the merits of Plaintiffs' procedural due process claim.

### b. Secretary Kemp Will Not Suffer Irreparable Injury Absent a Stay

Secretary Kemp urges the Court to find that the administrative burdens of complying with the injunction so close to the election will cause irreparable harm by adding "brand new, untested processes ad hoc to long established election procedures at the eleventh hour," causing uncertainty and confusion, and undermining the integrity of the election process. See GMVP Dkt. No. [33] at 2. The Court disagrees that the administrative burdens on the State constitute irreparable harm. As discussed *supra*, the injunction simply requires the State to apply preexisting procedures to a small fraction of Georgia's absentee voters. Compare Fish v. Kobach, No. 16-2105-JAR, 2016 WL 3000356, at *3-5 (D. Kan. May 25, 2016) aff'd, 840 F.3d 710 (10th Cir. 2016) (finding that an injunction requiring elections officials to review and modify the records of 7,025 individuals did not constitute irreparable harm) with Dkt. No. [33] at 10 (Secretary Kemp noting that only nine absentee ballots have been rejected due to signature mismatch in Gwinnett County thus far). Granting a stay at this juncture would only cause confusion, as Secretary Kemp has already issued guidance in

9

accordance with the injunction to county elections officials. See, e.g., GMVP Dkt. No. [37-1] ¶ 4.

Moreover, in an effort to acknowledge that there is some burden on the State inherent in implementing a preliminary injunction, the Court solicited suggestions from the State before issuing the final injunction. See GMVP Dkt. No. [28] at 29. Secretary Kemp did not provide *specific* suggestions as to how the Court might issue the injunction to optimize ease in implementation of appeals procedures. Indeed, while Secretary Kemp now alleges he will suffer because "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury," this is the first time that Secretary Kemp has raised this issue. Id. at 18-19. But as Plaintiffs correctly note, the injunction does not prevent Secretary Kemp from effectuating the statutes—indeed, at oral argument his counsel conceded that various counties already construe the statute as permitting voters to verify their signatures through extrinsic evidence. See Dkt. No. [36] at 11. The State must continue to comply as it always has with the statutes at issue; the injunction merely enhances the State's obligations towards a small subset of absentee voters.

In stark contrast to Secretary Kemp's vague assertions that the injunction will impose significant administrative and fiscal burdens, Plaintiffs have proffered specific evidence that this injunction will not cause irreparable injury by injecting chaos and uncertainty into the election process. To illustrate, after reviewing the guidance issued by Secretary Kemp following the injunction, Mr.

McRae stated that "I do not believe that it will be difficult to implement the guidance, which is pretty straightforward, even with a week left until Election Day." GMVP Dkt. No. [37-1] ¶ 6. Even Chris Harvey (Georgia's Elections Director) has admitted, in reference to this Court's then-proposed injunction, that "I do not believe it is impossible to make these changes." GMVP Dkt. No. [31-3] ¶ 5. In light of the foregoing, the Court finds that Secretary Kemp has not met his burden in showing that he will suffer irreparable harm absent a stay.

### c. Balance of Harms to Plaintiffs and Public Interest

By contrast, Plaintiffs will be irreparably injured if this Court issues a stay. If the Court issues a stay, Plaintiffs will have to continue diverting substantial resources towards assisting and warning voters about the possibility of a ballot application or ballot rejection due to a signature mismatch. GMVP Dkt. No. [36] at 18-19. Further, the Court has already determined that violation of the right to vote establishes irreparable injury because "it cannot be undone through monetary relief and, once the election results are tallied, the rejected electors will have been disenfranchised without a future opportunity to cast their votes." See Dkt. No. [28] at 26-27. Therefore, without injunctive relief, absentee voters whose applications or ballots are rejected due to a signature mismatch risk being completely disenfranchised from the upcoming election.

In a similar vein, the public interest counsels in favor of denying the stay. The Court finds that the public interest is best served by allowing qualified absentee voters to vote and have their votes counted. This injunction ensures that

11

absentee voters who are unable to vote in person and whose applications or ballots are rejected based on a signature mismatch will still have the opportunity to have their votes counted in the upcoming election.

### III.  CONCLUSION

Secretary Kemp's Emergency Motion for Stay Pending Appeal of Preliminary Injunction, GMVP Dkt. No. [33]; Martin Dkt. No. [27], is **DENIED**.

**IT IS SO ORDERED** this 30th day of October, 2018.

*[signature]*
**Leigh Martin May**
**United States District Judge**